489 A.2d 828

**Victor ROSSI, Jr., Appellant,**

v.

**The PENNSYLVANIA STATE UNIVERSITY, Donald W. Johnson, Individually and as Udis Director, Robert Dunham, Individually and as Vice President for Undergraduate Studies, Quentin Wood, President of the Board of Trustees and Edward D. Eddy, Provost, Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 18, 1984.

Filed March 1, 1985.

40

42

■■■■■■■■■■■■■■■■■■■■■■■

Joseph A. Grappone, Assistant Public Defender, Altoona, for appellant.

R. Mark Faulkner, Langhorne, for appellees.

Before CAVANAUGH, CIRILLO and JOHNSON, JJ.

CAVANAUGH, Judge:

Victor Rossi, Jr., the appellant herein, had been employed at The Pennsylvania State University at State College, Pennsylvania, as a motion picture production specialist in the University Division of Instructional Services (UDIS). The appellant commenced an action in trespass and assumpsit against The Pennsylvania State University, Donald W. Johnson, Director of the University Division of Instructional Services, Robert Dunham, Vice President for Undergraduate Studies, Quentin Wood, President of the Board of Trustees of The Pennsylvania State University and Edward D. Eddy, Provost of The Pennsylvania State University, the appellees herein. The complaint contained two counts: count one was in trespass for wrongful discharge and count two was in assumpsit for breach of contract. Count one of the complaint alleged that the appellant, while an employee at The Pennsylvania State University from 1976 until he was discharged in July, 1980, continually pointed out to his superiors, Johnson and Dunham, "the waste of tax dollars, mismanagement of U.D.I.S., waste of the much needed U.D.I.S. facilities and services and in general significant waste of a multi-million dollar media facility over several years."

With respect to his alleged wrongful discharge, the appellant further contended:

13. That after years of effort in trying to get the director of U.D.I.S., defendant Johnson to stop the waste, and also his supervisor defendant, Dunham, and the Provost Office through defendant Eddy and even the Board of Trustees through defendant Wood, plaintiff was wrongfully discharged as a direct result of such efforts. 15. The plaintiff was wrongfully discharges [sic] for attempting to promote the public policy of stopping the waste of tax dollars and providing the state with an effective resource for which there is a clear mandate, and which was being violated by the University and its agents, the above named defendants and each of them.

Count Two, which sounded in assumpsit, alleged that Johnson and Dunham and appellant "entered into an oral agreement wherein defendant agreed to give plaintiff the first job opening in his field or to retrain plaintiff for any job that opened in another field." It was further alleged that defendants, appellees, breached their agreement by giving a job in appellant's field to one Gerald Hutchinson and that "Dentant [sic] Wood and Eddy acquiesced in such actions with disinterested malice."

The court below entered an order granting the appellees' motions for summary judgment as to Count One and the motions for summary judgment of appellees Eddy, and Wood, as to Count Two. The motions for summary judgment by appellees, The Pennsylvania State University, Johnson and Dunham as to Count Two, were denied. An appeal was taken to this court from the order of July 13, 1983.

 The first problem we consider is whether the order granting summary judgment in favor of all of the defendants as to Count One and as to defendants, Quentin Wood and Edward D. Eddy as to Count Two is appealable. While the appellees have not raised this issue, we may do so *sua sponte*. *Rigidply Rafters, Inc. v. Aetna Casualty & Surety Co.*, 311 Pa.Super. 549, 457 A.2d 1318 (1983); *Swift v. Milner*, 296 Pa.Super. 463, 442 A.2d 1144 (1982). Generally, an order is interlocutory and not appealable unless it effectively puts the litigants out of court, terminates the litiga-

tion or disposes of the entire case. *Rigidply Rafters v. Aetna Casualty & Surety Co., supra.* In applying the rule "we must look beyond the technical effect of the adjudication to its practical ramifications." *Jackson v. Moultrie,* 288 Pa.Super. 252, 255, 431 A.2d 1033, 1034–5, (1981). In the instant case, the matter has not been ended by the court's grant of limited summary judgment and the litigation continues. However, the appellant is out of court as far as Count One is concerned and as far as defendants Eddy and Wood are concerned in Count Two. An analogous case is found in *Praisner v. Stocker,* 313 Pa.Super. 332, 459 A.2d 1255 (1983). In that case the plaintiff joined three separate causes of action in one complaint. One count alleged false arrest and malicious abuse of process. Another count alleged assault and battery. The court below entered summary judgment in favor of one defendant in the count alleging false arrest and abuse of process. We held that the appeal was proper and that "where, as here, a final judgment has been entered on a separate cause of action, that judgment is appealable." In the instant case, a final judgment has been entered as to Count One as far as all defendants are concerned and is appealable under *Praisner v. Stocker, supra.* A separate problem exists as to Count Two, alleging an oral contract. The court entered summary judgment only as to defendants, Wood and Eddy, and the action continues as to defendants Johnson and Dunham in their individual and representative capacities and against The Pennsylvania State University. While the action continues below, it is terminated as far as appellant's claim against Eddy and Wood are concerned and summary judgment in their favor is, therefore, appealable.

 Returning to our consideration of the appeal on its merits, we find that the court below properly granted summary judgment to all appellees as to Count One.[1] Sum-

---

**1.** Appellee's motion for summary judgment was filed under Pa.R.C.P. 1035 which provides in part:

**Rule 1035. Motion for Summary Judgment**

(a) After the pleadings are closed, but within such time as not to delay trial, any party may move for summary judgment on the

mary judgment may be granted if the pleadings, depositions, answers to interrogatories and admissions on file, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Williams v. Pilgrim Life Insurance Co.*, 306 Pa.Super. 170, 452 A.2d 269 (1982); *Scheetz v. Borough of Lansdale*, 64 Pa.Cmwlth.Ct. 24, 438 A.2d 1048 (1982). It is basic that summary judgment may be entered only in a case that is clear and free from doubt. *Dunn v. Teti*, 280 Pa.Super. 399, 421 A.2d 782 (1980); *Tom Morello Construction Co. v. Bridgeport Federal Savings & Loan Association*, 280 Pa.Super. 329, 421 A.2d 747 (1980). The appellees' motions were based on the pleadings and appellant's uncontradicted depositions. The appellant's job consisted of making films for various university departments using university equipment. He alleged that prior to and at the time of his firing, he informed his superiors that although the university had purchased millions of dollars of equipment to make movies, that his superiors were not utilizing the UDIS or its staff to make movies, but were instead paying a great deal of money to outside private companies to make movies. He specifically testified that on or about February 8, 1980, the appellant was informed that his position would be terminated on or about July 1, 1980 because of a reduction in the UDIS budget and lack of work in the appellant's area of employment. In general, an employer may discharge an employee at any time, without cause, in an employment at will, as we have in this case. However, the leading case of *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974) established the principle that an employee at will may have a cause of action against the employer for wrongful discharge when the discharge threatens public policy.

pleadings and any depositions, answers to interrogatories, admissions on file and supporting affidavits.

(b) The adverse party, prior to the day of hearing, may serve opposing affidavits. The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

This court pointed out in *Yaindl v. Ingersoll-Rand Co.* 281 Pa.Super. 560, 572, 422 A.2d 611, 617 (1980) that "the precise extent to which the employer's interest in running his business is limited by considerations of public policy cannot be stated but must be worked out on a case by case basis." The court further stated at 281 Pa.Super. 573, 422 A.2d 618:

> On the case before it the Court found that the employer's exercise of the right to discharge an employee at will was not impermissible because no facts were alleged from which one could infer that the employer discharged the employee with the specific intent either to harm him, or coerce him to break any law, or otherwise compromise himself. 456 Pa. at 178, 180, 319 A.2d at 177–178.[5]

Footnote 5 states:

5. It is sometimes said that *Geary* recognizes an action for wrongful discharge by an employee at-will in two situations: 1) where the employer's discharge is motivated by a specific intent to harm the employee; and 2) where the discharge violates a clear mandate of public policy. *See O'Neill v. ARA Services, Inc.,* 457 F.Supp. 182, 186 (E.D.Pa.1978). While this is a fair reading of *Geary,* as our foregoing discussion indicates, we think it more accurate to say that *Geary's* proscription of a discharge motivated by a specific intent to harm is rather an example of when a discharge violates public policy.[2]

2. See Public Policy Limitations to the Employment at Will Doctrine since *Geary v. United States Steel Corporation,* 44 University of Pittsburgh L.R. 1115, 1123–4: (1983)

The holding in *Geary* is couched in negative terms: an employee will have *no* cause of action for wrongful discharge if there is a plausible and legitimate reason for the termination disclosed in the complaint and no clear mandate of public policy is violated. Although the court used the conjunctive in establishing the two elements which, if found, will *not* produce a cause of action for wrongful discharge, it is ambiguous whether the presence of either of the two elements (a plausible and legitimate reason for termination or a violation of a clear mandate of public policy) by themselves are sufficient to establish a wrongful discharge action. Thus in *Reuther,* even if the jury found that there was just cause for

In the recent case of *Cisco v. United Parcel Service*, 328 Pa.Super. 300, 476 A.2d 1340 (1984) the trial court sustained preliminary objections to a complaint alleging wrongful discharge. The appellant, who worked for United Parcel Service, was discharged by his employer after he was charged with theft and trespass resulting from making a delivery. He was subsequently tried and acquitted by a jury, but his employer refused to rehire him. The court held that no public policy was violated by discharging the complainant on the basis of his having been charged with a crime in the circumstances of this case. We noted that in deciding cases involving alleged wrongful discharge there

is the necessity for a thorough review of the circumstances surrounding a discharge of an at-will employee.[4] First, we must discern whether any public policy is threatened thereby; second, even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so. (Footnote omitted.)

328 Pa.Super. at 306, 476 A.2d at 1343.

In *Geary* the employee was discharged because he was concerned that a product of his employer constituted a serious danger to anyone using it, and expressed this reservation to a vice president in charge of selling the product. He alleged that he acted with the best interest of the company and the general public in opposing the marketing of a product he believed to be defective, and that he was dismissed because of his activities. In *Yaindl, supra,* summary judgment was entered. The appellant alleged that certain pumps posed a serious safety hazard for those working near them. The court pointed out, however, that "no indication of the specific hazards supposedly posed by the pumps at the Ilatsider plant is to be found in the record,

the dismissal but that a clear mandate of public policy was nonetheless violated, a cause of action for wrongful discharge could only arguably be sustained.[61] Alternatively, if the jury found that no violation of a public policy had occurred but that there was no plausible and legitimate reason for the discharge, it is questionable whether a cause of action would lie.

nor any instance of any injury caused by any pump sold by [the defendants]." This court held that summary judgment in favor of the defendant with respect to the claim of wrongful discharge was proper as we were unable to discern any clear public policy that was threatened by his discharge, even though there was a claim that public safety was involved.

These cases must be contrasted with *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) where we reversed the entry of compulsory nonsuit in favor of the employer. The evidence supported the conclusion that the plaintiff was fired because he served on a jury. We held that the jury should have been allowed to determine if this was, in fact, the reason for his dismissal.

Similarly, in *Hunter v. Port Authority of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980), we reversed the dismissal of the complaint for failure to state a cause of action. The complaint alleged that the plaintiff applied for a job as a bus driver, but that he was not hired because he did not reveal on his application that he had been convicted of aggravated assault and battery, although he was subsequently pardoned by the governor. We held that the court should not have sustained the defendant's demurrer as "the reasonableness of the Port Authority's refusal to hire the appellant is not apparent on the face of the complaint." 277 Pa.Super. 17, 419 A.2d 638.

In the instant case, the appellant alleges that he was fired because he pointed out to his superiors ways in which tax money could be saved by using the resources of UDIS. It is alleged that there is a clear public policy to save tax dollars and that his employer violated this policy by firing him. All would agree that it is desirable to save taxpayers' money, but the issue in this case does not go to that principle, but rather whether the employer violated a public policy in firing the appellant. We must view all of the evidence in the light most favorable to the appellant as the non-moving party, in connection with the motions for summary judgment. *Bowman v. Sears, Roebuck & Co.*, 245

Pa.Super. 530, 369 A.2d 754 (1976). Using this test, it was established that the appellant was employed by The Pennsylvania State University as a motion picture production specialist from 1972 until June, 1980. In 1978 he was awarded a master's degree by Pennsylvania State University in the College of Liberal Arts. While employed at Penn State he worked on films and he described his duties as follows.

Q. You will have to bear with me. What does working on the film involve?

A. That includes developing an idea for the film, a basic thought for the film, trend or the story line, preparing the equipment to shoot it, shooting it, the film, making sure the film was processed and after it was returned from the processor it was to be checked, sent in for work print or stored or whatever.

That responsibility was at the hands of the motion picture production specialists, such as myself.

Dr. Johnson was the Director of UDIS and Dr. Dunham was a Vice President for Undergraduate Studies which oversees UDIS. Both Dr. Dunham and Dr. Johnson were the appellant's superiors. Appellant went to Dr. Johnson in 1978 after he had received his master's degree and told him that he wanted "to be more helpful in helping UDIS be more visible, proactive, productive and better service the University." Dr. Johnson told him in effect that he didn't want his talents. The appellant then told Johnson that he had "no intention of leaving Penn State because there appears to be work to be done here" and that perhaps he had better take this up with Dr. Dunham (Dr. Johnson's superior) and Johnson told him to do so. The appellant then went to Dr. Dunham and again complained about UDIS that it was "not visible. It is not proactive. It is not productive. It is not serving the University in its best interests. I would like to help for it to do that." Dr. Dunham said that he would see what could be done.

There was a reorganization that went into effect in 1979 but appellant was still not satisfied and again complained to Dr. Dunham as follows:

This is after the reorganization, and I told Doctor Dunham that I was very optimistic about it, about the fact that it was reorganized. But I was afraid that the only thing that was done was superficial changes and that the fact that UDIS was not proactive, visible, productive or serving the University to its capacity, to the capacity that it should was going to continue even though there was a reorganization.

These were basically the same complaints that appellant had before the reorganization, and after the reorganization work was declining in the motion picture section. The appellant asked both Dr. Johnson and Dr. Dunham that he be allowed to find work for UDIS outside of the University, but he was not permitted to do so.[3] Appellant further testified:

I said, Dr. Dunham, why is Motion Picture Services suffering when an outside entity is coming in and taking University dollars. I found this highly incongruent.

3. With respect to the decline of work in the motion picture section and the appellant's desire to bring in outside work he testified as follows:

Q. Was your work declining in the Motion Picture section?

A. Absolutely it was declining. I offered to Doctor Johnson during my 1978 conversation: Let me go out and find work.

I made that offer. I made the offer again to Doctor Dunham: Let me go out. I have contacts through professional organizations and some of the work that I had done which had received awards. I was making contact with people who could have used our services.

Q. You are speaking now of people within the University?

A. No. I am talking about people outside the University. People within the University were in the same position we were. They didn't have the money to spend on films.

The appellant also testified that after he was fired there were still two employees at the University doing film work. He was asked:

Q. Was there enough work for those two?

A. I would say not, but they were doing other activities. Mr. Conklin was working in the tv section, and Mr. Hughes began working on audio tapes for still photo slide tape shows.

*But as far as the film work was concerned it kind of went by the boards.* (Emphasis added.)

I told Doctor Dunham, Doctor Dunham, something is wrong at UDIS. *Do something about it or else I will go to people who will listen to me before they listen to you.*

Q. What in your view was wrong with UDIS at that point?

A. An incompetent supervisor who didn't care and was cruel and demeaning to staff members, who did not have the best interests of the University at heart. He didn't care.

. . . .

When I spoke to Doctor Dunham he said to me: What do you want me to do, fire him? In reference to Doctor Johnson.

. . . .

And I said, no, Doctor Dunham, but just pay attention to what is not happening at UDIS and maybe we can resolve the problem. And I walked out of his office.

That happened in 1979 right after the supposed reorganization. (Emphasis added.)

In April, 1980, the appellant sent a memorandum to Dr. Edward D. Eddy, the University Provost, complaining about "administrative incongruities, inconsistencies and irregularities" which were having a "deleterious effect upon the UDIS staff." The memorandum concluded with an implied threat: *"I am sincerely hopeful that this matter may be addressed in a proper manner, within the inner structure of the University, thus averting any external embarrasment."* (Emphasis added.)

With respect to the memorandum sent to the Provost, the appellant testified:

Q. Can you explain what you mean by certain administrative incongruities, inconsistencies and irregularities?

A. Yes. I thought you would never ask.

Incongruities. *It was incongruous to me that Doctor Johnson's superior had been told by several UDIS staff*

*members and nothing had been done about the situation.*

It was incongruous to me that certain supervisors were sent to national gatherings and brought back nothing but restaurant reports.

It was incongruous to me that certain individuals were rewarded for mediocre performance and others were not rewarded for superior performance.

*It is inconsistent that the individuals like Mr. DiMeo and myself should be made to suffer while it was we among others who were trying to improve the performance quietly, improve the performance of UDIS.*

Q. When you say made to suffer, I assume you mean losing your job, is that correct?

A. I would say being screwed out of our jobs, yes. That is what I would say. (Emphasis added.)

After the appellant's employment with the University was terminated in June, 1980, he wrote "as a concerned alumnus" to Quentin E. Wood, the President of the Board of Trustees of the University on May 13, 1981 and again complained about the waste of abilities, facilities, and other resources at UDIS and the fact that he received no administrative encouragement in his attempts to correct the deficiencies that he saw.[4] The appellant testified that his complaints in the letter of May 13, 1981 were basically the same as he had prior to his discharge from the University.

The appellant testified specifically as to what he considered a waste of taxpayers dollars. He felt that the studios were only being used 50% of the time and that the "Director of UDIS did not know the mission of that particu-

---

4. The letter to Mr. Wood concluded with the following:

And, too, is it fair that Mr. Dimeo and this writer were made to suffer while we, along with a few others, were attempting to make UDIS more competitive, pro-active, productive, and visible *despite the absence of administrative encouragement?*

Finally, is there a trustee among you who cares enough about Penn State University and has the intestinal fortitude to properly address the issues I have presented? Mr. Dimeo and this writer would certainly like to hear from you so that we may meet to discuss this matter in more detail. (Emphasis added.)

lar unit, ..." He also testified that a lot of expensive film equipment was not being used. Good use was not being made of the "sound professional staff.... Those of us that had the intestinal fortitude to stick around under the circumstances were quite proficient in our work although we were stifled by the lack of administration and supervision there to do work." Appellant also testified that in his view at least one-half million dollars of university funds were not being used effectively over a period of five or six years.

Appellant testified that he was told at a meeting with Dr. Dunham and Dr. Johnson on February 8, 1980, that his position at the University would be terminated.[5] Dr. Dunham and Dr. Johnson informed the appellant "that because of budget cuts my position as motion picture production specialist was going to be closed." The appellant agreed that there were budget cuts within UDIS, but testified that in his view he was fired because of his "willingness to point out the shortcomings and the waste of abilities, facilities and our resources including tax dollars at UDIS."

Clearly the appellant disagreed with the way his immediate superior, Dr. Johnson, was running UDIS. His criticism included the basic complaint that Dr. Johnson did not even know what the mission of UDIS was, although the appellant did. He threatened Dr. Dunham, who was Dr. Johnson's superior, that if Dunham did not do something to improve the situation at UDIS that the appellant would "go to people who will listen to me before they listen to you."

**5.** The appellant recorded on tape the meeting of February 8, 1980 and testified "Not wanting to leave myself defenseless, I took a tape recorder to that meeting." He further testified:

A. Well, my reason for taping was I was in a vulnerable position, that I had told Dunham about the waste at UDIS. I told Johnson about the waste at UDIS.

I felt if I was going to go into a confrontation with those gentlemen regarding my continued employment at the University that I had better keep a record of what was said and the promises made.

The tape recorder was in plain view, and they did not question its presence.

The whole conversation which is approximately 38 minutes or so is on the tape.

Appellant had a litany of complaints that his department was not proactive, visible, productive or serving the university and that, he and apparently others not in a management position, should be allowed to correct the situation. What existed as far as appellant was concerned was a classic example of an employee disagreeing with management decisions and complaining about the lack of competency and indifference of his superiors. He eventually was fired, and the reasons given were budget cuts within UDIS, which the appellant admitted existed.

 We must not lose sight of the fact that in an employment at will under common law, the employee may be dismissed at any time without cause. The other side of the coin is that the employee may leave his employment at any time without incurring any legal obligations. An exception has been introduced to this rule under the public policy limitations, but there must be a clear mandate of public policy that has been violated, in order to trigger the exception. The question before us is whether there is a public policy against firing an employee who continuously complains about what he considers to be poor management of the unit in which he is an employee. In every situation in the public sector, where there is poor management, a loss of tax payers' dollars must necessarily follow. Nevertheless, the test is still whether there is a public policy against terminating an at will employee who disagrees with the way in which his superiors are managing the department encompassing his employment.[6] We think not. Initially this would have the unwise effect of transferring to the judicial forum the duty of evaluating the propriety of management decisions. The appellant was completely dissatisfied with the management of his department and attempted to influence his superiors to change the way in which things were being accomplished. He was especially hostile to the Director of his division, Dr. Johnson. An employer may rid

6. For the purpose of this discussion, we are accepting the appellant's conclusion that he was fired as a result of his complaints about misuse of facilities and personnel within his department, and not as his superiors stated that he was fired because of budget cuts.

itself of a troublesome employee, without liability for wrongful discharge in the absence of a violation of public policy. *Boresen v. Rohm & Haas, Inc.,* 526 F.Supp. 1230 (E.D.Pa.1981). We agree with the court below that the appellant was not in a management position and yet he attempted to assume management prerogatives. We find no violation of public policy sufficient to justify an exception for the appellant. In *Callahan v. Scott Paper Co.,* 541 F.Supp. 550 (E.D.Pa.1982) the plaintiffs alleged that they were wrongfully discharged because they objected to the fact that their employer, Scott Paper Company, was giving unlawful price discounts. The district court granted the motion of Scott Paper Company to dismiss the plaintiffs' wrongful discharge claims. The court found that there was no real distinction in the public policy concerns in *Geary, supra,* and those involved in the Scott Paper Company case. "Accordingly, if the balance in *Geary* tipped in favor of the employer, I see no reason why the results should be otherwise here." 541 F.Supp. 563. The court noted at 541 F.Supp. 562–63:

> The Pennsylvania Supreme Court has never elaborated on its decision in *Geary,* but the dicta suggesting an exception to the employment at-will doctrine where the discharge violated a clear mandate of public policy was taken up shortly thereafter by several courts as embodying the law of Pennsylvania.

> . . . .

> Although each case must be decided on its own facts, these cases are nonetheless revealing in that they evidence the great reluctance of the courts to recognize a right of action in an employee who alleged that he was terminated in contravention of public policy.

■ In this case, the appellant did not allege a specific intent to harm him, which might have supported an action for wrongful discharge. *Yaindl v. Ingersoll-Rand Co., supra; Harrison v. Fred S. James, P.A., Inc.,* 558 F.Supp. 438 (E.D.Pa.1983). His cause of action must therefore

stand or fall on violation of public policy and we find that there was no such violation.

The appellant also contends that the court below erred in granting summary judgment in favor of the appellees, Quentin Wood, the President of the Board of Trustees and Dr. Edward D. Eddy, the Provost of the University. This contention is without merit. The appellant does not claim that Eddy and Wood were involved in the breach of an alleged contract, but that they "acquiesced in such actions with disinterested malice." The appellant admits that Mr. Wood and Dr. Eddy had no personal involvement in the alleged contract. We are satisfied that the pleadings and deposition establish no cause of action against Mr. Wood and Dr. Eddy and that summary judgment was properly entered in their favor. An agent of a disclosed principal is not personally liable in a contract between the principal and a third party. *Vernon D. Cox & Co. v. Giles,* 267 Pa.Super. 411, 406 A.2d 1107 (1979).

Judgment affirmed.