539 A.2d 865

**Frank DiBONAVENTURA, Appellant,**

v.

**CONSOLIDATED RAIL CORPORATION.**

Superior Court of Pennsylvania.

Submitted Feb. 9, 1988.

Filed March 31, 1988.

Dennis J. Muir, Media, for appellant.

John R. Jenchura, Philadelphia, for appellee.

Before CIRILLO, President Judge, and TAMILIA and HESTER, JJ.

CIRILLO, President Judge:

This is an appeal from an order of the Court of Common Pleas of Delaware County granting Consolidated Rail Corporation's (Conrail) motion for summary judgment. We affirm.

Frank DiBonaventura was an employee of Conrail from its inception in 1976 until he was terminated by the company on May 25, 1982. DiBonaventura had begun his employment in the railroad industry in 1946 working as a clerk for the Pennsylvania Railroad Company. Upon the merger of

that company with New York Central, DiBonaventura continued as an employee of the Penn Central Transportation Company. Conrail acquired Penn Central's assets in 1976, and appellant continued as an employee there for the next six years. At the time of his discharge, he was employed as the assistant manager of a Conrail real estate office in King of Prussia, Pennsylvania.

In his complaint, DiBonaventura alleged that Conrail discharged him because he refused to agree to certain real estate sales in Washington, D.C., which involved selling property there for less than the highest bid made. Conrail contends that DiBonaventura was discharged for allowing H.J. Heintz, a representative of H.G. Heintz, Inc., a past buyer of Conrail property, to pay for repair work done to his house, and that such actions were grossly improper and violated the company's conflict of interest policies. DiBonaventura maintains that the contractor he used was recommended to him by Heintz but that he had no knowledge that Heintz had agreed to pay the contractor.

DiBonaventura brought suit against Conrail in federal court, alleging that he had entered into an implied contract of employment with Conrail, and had been wrongfully discharged. That action was dismissed without prejudice by the Honorable Edward N. Cahn for lack of subject-matter jurisdiction, and transferred to the Delaware County Court of Common Pleas. Conrail filed a motion for summary judgment; the court deferred disposition of that motion upon DiBonaventura's request for discovery. After discovery, DiBonaventura amended his complaint to include allegations concerning a written document entitled, "Management Performance Appraisal Agreement," and an accompanying manual. DiBonaventura argued to the trial court in a memorandum of law that these documents represented a contract of employment between himself and Conrail. On March 18, 1987, the Honorable Clement J. McGovern granted Conrail's motion for summary judgment. DiBonaventura filed a petition for reconsideration which the court denied. He then appealed to this court.

DiBonaventura raises four arguments on appeal, all of which center around the question of whether or not an implied contract of employment existed between himself and Conrail. He argues firstly that the trial court failed to properly apply the standard of review in its grant of summary judgment. He then argues that the Management Performance Appraisal Agreement was an implied contract which would have removed him from the at-will presumption. Thirdly, he contends that contract terms of duration and just cause may be implied from the evidence presented. Lastly, he claims that a covenant of good faith and fair dealing may also be implied from the record and the evidence. After reviewing the pleadings, we find that no genuine issue of material fact exists, and that Conrail is entitled to the judgment in its favor as a matter of law.

In reviewing a motion for summary judgment, the appellate court must review the record in the light most favorable to the nonmoving party. Any doubt must be resolved against the moving party; *Garcia v. Community Legal Services Corp.*, 362 Pa.Super. 484, 494, 524 A.2d 980, 985 (1987). Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Summary judgment may be entered only in a case that is clear and free from doubt. *Rossi v. Pennsylvania State Univ.*, 340 Pa.Super. 39, 45, 489 A.2d 828, 831 (1985).

█ In this Commonwealth, we have long recognized that an employer has the right to discharge an employee who has no definite contract of employment at any time and for any reason. *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974); *Henry v. Pittsburgh & L.E.R.R.*, 139 Pa. 289, 21 A. 157 (1891). We have recognized, however, that certain limited exceptions to the at-will doctrine exist. An employee handbook that explicitly indicates that discharge will be for just cause only may create an implied contract of employment. *See, e.g., Greene v. Oliver Realty*

*Co.,* 363 Pa.Super. 534, 526 A.2d 1192 (1987); *Banas v. Matthews International Corp.,* 348 Pa.Super. 464, 502 A.2d 637 (1985); *Richardson v. Cole Memorial Hosp.,* 320 Pa.Super. 106, 466 A.2d 1084 (1983). This, of course, would remove the employee from at-will status. Evidence of additional consideration given the employer by the employee also removes the case from the at-will doctrine. *See Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571 (1986). We have also recognized a very limited public policy exception in this Commonwealth where the employee's discharge would violate a discrete public policy. *See Hunter v. Port Auth.,* 277 Pa.Super. 4, 419 A.2d 631 (1980); *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978). Courts of some states have implied just cause requirements in all terminations, *see* Comment, *The Role of Federal Courts in Changing State Law: The Employment At-Will Doctrine in Pennsylvania,* 133 U.Pa.L.Rev. 227 (1984), Pennsylvania is not among these.

■ DiBonaventura argues that an implied contract existed between himself and his employer. In support of this contention, he points to the Management Performance Appraisal Agreement, the manual used to utilize that Agreement, and a policy and procedure manual developed by Conrail. The at-will employment presumption will be overcome only if the employee can show with clarity and specificity that the parties contracted for a definite period. *Greene,* 363 Pa.Super. at 555, 526 A.2d at 1202. In order for an employee to carry his burden of proving that the at-will employment contract has been modified into employment for a specified term, he must show from the circumstances surrounding the undertaking of employment that the parties did not intend the employment to be at-will. *Veno,* 357 Pa.Super. at 96–97, 515 A.2d at 577; *Darlington v. General Elec. Corp.,* 350 Pa.Super. 183, 193, 504 A.2d 306, 311 (1986). The burden of proof here is very great: "[M]odification of an 'at-will' relationship to one that can never be severed without 'just cause' is such a substantial modification that a very clear statement of an intention to

so modify is required." *Veno,* 357 Pa.Super. at 99, 515 A.2d at 578. The courts will not unheedingly infer such an intention. *Id. Darlington,* 350 Pa.Super. at 197, 504 A.2d at 313. Generally, the question of intent of the parties is a question for the jury. If, however, the resolution of the issue is so clear that reasonable minds would not differ on its outcome, the court may decide. *Greene,* 363 Pa.Super. at 556, 526 A.2d at 1202. In cases involving implied contracts of employment, the litigant will be able to reach the jury only if he can clearly show that he and the employer intended to form a contract. *Id.,* 363 Pa.Superior Ct. at 551, 526 A.2d at 1200.

We have stated that sufficient additional consideration is one factor which could imply an intention to change the at-will relationship. *Greene,* 363 Pa.Super. at 555, 526 A.2d at 1202. The argument also has been made that employee handbooks and policy manuals may evidence such an intent. *See Banas, supra; Richardson, supra.* That is what Di-Bonaventura's arguments in this case amount to. The recent cases in which we have discussed this topic are worth examining before we consider the evidence that he has placed before us.

At one point, the unilateral nature of the handbook and policy played an important role in our decisions. In *Richardson v. Cole Memorial Hospital,* an employee handbook stated that it was the policy of the employer to provide employment to an employee as long as his work proved satisfactory. *Richardson,* 320 Pa.Super. at 108, 466 A.2d at 1085. We held there that no meeting of the minds had occurred between employer and employee since the handbook and policies had been implemented unilaterally. *Id.* Since then, we have come to realize that this approach to the issue leads to no resolution. In *Greene,* we noted that "[m]utuality of obligation is a thoroughly discredited notion. As previously discussed, it is inapplicable to unilateral contracts. Any rule which purportedly derives its legitimacy from this principle is a rule deserving of rapid interment." *Greene,* 363 Pa.Super. at 552, 526 A.2d at 1200.

In *Martin v. Capitol Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986), we quoted *Richardson* with approval, but stated that it was unnecessary to analyze the existence of consideration for the handbook, preferring rather to discuss whether or not a reasonable employee in the position of the appellant would understand the employer to be reasonably bound by its representations in the handbook. *Martin*, 354 Pa.Super. at 212, 511 A.2d at 838; *see also Reilly v. Stroehmann Bros.*, 367 Pa.Super. 411, 420, 532 A.2d 1212, 1217 (1987) (Cirillo, P.J., concurring). Because the issue of whether or not handbooks are bargained for appears to us to be one based upon the mutuality of obligation, and therefore ripe for interment, we see no need to consider the fact that the policies were unilaterally implemented here. Our inquiry will consider the issue of whether or not a reasonable employee in DiBonaventura's position would have expected the Agreement, policies, and manual that he cites in his amended complaint to provide him with a specific term of employment.

Further, we must consider this court's en banc decision in *Banas v. Matthews International Corp.* In that case, an employee handbook was distributed to employees, and ostensibly gave employees permission to make items for personal use. Banas, however, was terminated for making a gravemarker for a relative. *Banas*, 348 Pa.Super. at 485, 502 A.2d at 648. We held that *"if* the handbook had contained, if not expressly, at least by clear implication a just cause provision, *then* appellee's claim might have merit." *Id.*, 348 Pa.Superior Ct. at 484–85, 502 A.2d at 648 (emphasis in original deleted). This comports with our holdings in other implied contract cases. We must be extremely reluctant to find that a contract existed when it is based upon anything less than express or at the least clearly implied indications of intent:

> This court, however, has repeatedly refused to recognize contractual modification of the at-will rule absent a clear expression of the parties' intent.... The need for clarity is not unique to the at-will employment cases. A party

who wishes to enforce a contract must plead every element of that contract specifically, and clarity is particularly important when the alleged contract is oral.... We cannot give legal significance to vague promises or to statements that reflect only the aspirations or hopes of the employer, whether written or spoken. The ordinary language of friendship and collegiality should not usually bind the speaker or writer as an enforceable obligation.

*Clay v. Advanced Computer Applications, Inc.*, 370 Pa.Super. 497, 511, 536 A.2d 1375, 1383 (1988) (en banc).

■ DiBonaventura argues that because the employees were to sit down with their supervisors and discuss techniques by which they could better their own performance, and because the appraisals were to be carried out at least once a year on the individual's employment date, the employer had contracted not to discharge employees except for just cause. DiBonaventura cites to us the following passages from the Agreement and its implementing manual:

> The Management Performance Agreement specifies the personal performance standards of each non-agreement employee in the Finance and Administration Department. It is in a sense a contract between the superior and the subordinate as to what will constitute the responsibility areas and expected performance levels of the employee's job. As such, the terms of this agreement need to be discussed by the two parties until its terms and limits are acceptable to each.

> .     .     .     .     .

> This alignment of personal needs to corporate needs and personal plans to corporate plans is the very nature of commitment, and is, therefore, the surest way to better management performance.

> .     .     .     .     .

> ... We expect that Management Performance Agreements will occur regularly at each employee's anniversary date or at each change in his job status.

DiBonaventura would have us infer from this language that a contract of employment existed between Conrail and himself, and that the duration of that employment could be interpreted in two ways. He argues that the employment period could be determined to be for a one-year period, that is, until the anniversary date of employment, because the employer has implicitly agreed not to terminate the employee unless for cause during that period. He also argues that the period could be until he retires. He bases this argument upon his thirty-six years as a railroad employee, his seven years with the same job status, and what he refers to as a "five year plan" mentioned by his supervisor in a deposition. That "plan" involved forecasting his revenues for the next five years, and was intended to aid the company in projecting its profits.

We find the language of the manual to be vague, and more in the nature of a suggestion of how to implement the Agreement. It in no way supports an inference that a contract was meant to be formed here. It states, "This brochure contains *guidelines* and *general instructions* for the Performance Appraisal System...." Examining the language of the manual and the purpose of the Agreement, we cannot infer that the purpose of Conrail in developing the appraisal system was the provision of contractual terms of employment for its non-agreement employees:

> Our goal in taking this step is to make the appraisal process more versatile and useful for all non-agreement personnel.... It places more emphasis on planning and control and on management objectives, but it also enables you to control the extent of your participation in the objective-setting process.... [This new form] is designed to help you clarify your goals and what it will take to achieve them.

We further find that the Management Performance Appraisal Agreement is at the most aspirational and indicative of management's attempt to define goals and improve productivity and efficiency rather than to create an employment contract:

The new Performance Appraisal System emphasizes the need for each of us to set our goals and develop our own plans in light of these corporate objectives and to base our ratings as to the quality of our performance on our ability to successfully achieve them.

.    .    .    .    .

In subsequent years, the corporate goal setting process should contribute heavily to the terms of each performance agreement, even if this yearly corporate effort necessitates major adjustments in those terms. The key to this system is the accurate communication of the company's goals, and the department's or the unit's goals to each of us, and the consequent discussed alignment of these with our own personal goals. This is the very nature of "Commitment" and is, therefore, the surest way to better management performance.

The clear inference is that the manual and agreement were meant to increase productivity, better working relations, define expectations for employee achievement, and aid the company in forecasting its revenue for the following years. Donald Weis, one of DiBonaventura's superiors, stated in deposition that "[the Agreement] was simply a means of sitting down and setting goals in hopes and anticipation that they will be met. We had to do this so that my superiors knew what we set for goals for the department and this was done with all the employees." This explanation is further supported by the testimony of Gary Calega, who was connected with the Office of Administration and Performance at that time. "The terminology was used to encourage a dialogue between the supervisor and a subordinate with respect to the objectives for the upcoming year. . . ." The inference to be drawn here is that the intention was to create better management within the company, not to provide continual employment for employees.

■ DiBonaventura also argues that the depositions of supervisory employees, specifically of Samuel Seeman, indicate that Conrail had a policy of discharging its employees

*only* for cause. The federal courts of the Third Circuit have held that if an employee can allege specific facts to show that a custom and policy of discharging an employee *only* for cause have existed within a company, this may remove an employee from at-will status. *Novosel v. Nationwide Ins. Co.,* 721 F.2d 894, 902–03 (3d Cir.1983); *Adams v. Budd Co.,* 583 F.Supp. 711, 713 (E.D.Pa.1984). DiBonaventura contends that although there was no writing or evidence of a contract in the *Budd* case, and also no evidence of a custom or policy, all those things are present here, and therefore, summary judgment was improperly granted. We disagree. DiBonaventura has failed to show that any implied contract existed. Seeman's acquiescence to counsel's statement that "Conrail won't just terminate someone without good reasons for doing so" cannot provide the specificity and clarity necessary to show a custom or policy, or needed to modify the at-will employment situation.

After considering all the record evidence placed before us in the light most favorable to DiBonaventura, we cannot hold that it was the intention of Conrail to form a contract with its non-agreement employees. Further, we cannot see that any employee reading the handbooks and policies could reasonably believe that a contract did exist. The intent of the parties is not clear enough from the evidence to allow any court to imply a contract here. For us so to hold would be to turn every appraisal system utilized by management into an employment contract. We are not prepared to so vitiate the at-will doctrine. That is a matter for the legislature.

We hold that DiBonaventura was unable to show with sufficient clarity that the parties intended to modify the at-will employment situation. The trial court did not err in granting summary judgment. Because we find that no contract existed between Conrail and DiBonaventura to alter his at-will employee status, we do not need to consider the question of whether a convenant of good faith and fair dealing can be implied from the record. *See Bruffett v.*

431

*Warner Communications, Inc.,* 692 F.2d 910 (3rd Cir. 1982).

Order of the trial court is affirmed.