**P. Douglas MAIER,**

v.

**POLICE AND FIRE FEDERAL CREDIT UNION.**

**Civ. A. No. 92–1766.**

United States District Court, E.D. Pennsylvania.

Feb. 5, 1993.

Rosemarie Rhodes, Harper & Paul, Philadelphia, PA, for plaintiff.

Sandra A. Girifalco, Nicholas Deenis, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendant.

## MEMORANDUM/ORDER

KATZ, District Judge.

AND NOW, this 5th day of February, 1993, upon consideration of Defendant's Motion for Summary Judgment, it is hereby ORDERED that the Defendant's Motion is GRANTED for the following reasons:

### I. Facts

Plaintiff, P. Douglas Maier ("Plaintiff" or "Maier") sued Police and Fire Federal Credit Union ("Defendant" or "Credit Union") based upon the Credit Union's termination of the Plaintiff's employment. Plaintiff claims the Credit Union violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, because the decision to fire Plaintiff was based on Plaintiff's race/national origin (one-quarter Native American). Plaintiff also alleges Defendant breached an implied or explicit employment contract. Plaintiff also initially alleged in his complaint that the Credit Union violated 42 U.S.C. § 1981 and wrong-

fully discharged him; however, these claims need not be addressed as the Plaintiff has withdrawn both claims. *See* Stipulation (filed January 14, 1993).

The Credit Union hired Maier on July 11, 1988, as an internal auditor. In March 1989, Maier was promoted to the newly created position of Administrative Services Manager because Anthony LaRosa, the Credit Union's President and Chief Executive Officer, liked Maier and thought the new position would be a good opportunity for him. *See* A. LaRosa Deposition at p. 12. Maier had no prior experience in administrative services; he had worked as an auditor and accountant during the previous four years since his graduation from college. *See* Maier Resume. The Administrative Services Manager served the other departments within the Credit Union.

In May 1989, Maier received a performance evaluation which discussed his potential for performance in the position and expressed the Credit Union's belief that he could do the job. *See* May 1989 Performance Evaluation.[1] Maier received a 9 percent pay increase following the evaluation. *See id.* Despite the pay increase, Maier was dissatisfied with his raise. He felt it did not include an increase for the new responsibilities he had undertaken and it was not a promotional increase. *See* Maier Deposition at p. 85. Maier discussed his displeasure with Anthony LaRosa, who spoke with Maier's immediate supervisor, John Cassidy. *See id.* at 86. After these discussions, Anthony LaRosa agreed to have Maier reviewed in a few months and stated that Maier "would be given more money at that time." *See* A. LaRosa Deposition at pp. 14–15. As promised, Maier received another review in February 1990 and a 13 percent pay increase. *See* February 6, 1990 evaluation.

Toward the end of February 1990, however, Cassidy told Anthony LaRosa that Maier was not performing his job well. Cassidy asked that Maier be fired. *See* A.

LaRosa Deposition at p. 16. Although Cassidy requested more than once that Maier be fired for his failure to do his job, Anthony LaRosa insisted that Maier be given another chance. *See id.* at pp. 21–22.

In March 1990, John LaRosa was hired to replace Cassidy as Chief Financial Officer. During the transition period, John LaRosa became aware that Cassidy had not been happy with Maier's performance and LaRosa himself became aware of some problems. *See* J. LaRosa Deposition at p. 35. John LaRosa spoke with division directors who managed the departments that Maier served and received their assessment of Maier's performance and problems. *See id.* He learned that Maier's major problem was that he lacked credibility within the organization. *Id.* The directors were asked to put their comments about Maier in writing. At least three of the department directors responded by submitting memoranda to Cassidy and John LaRosa outlining serious problems concerning Maier's performance. *See* Memoranda received from Directors Gerald B. Fadden, John F. Brady, and Linda Rumick.

From the memoranda submitted by the department directors, a performance appraisal was prepared on April 13, 1990, and given to Maier on April 16, 1990. *See* April 1990 Appraisal. The appraisal discusses specific deficiencies of Maier, including poor interpersonal skills, lack of judgment, and poor managerial skills. *See id.* Specific examples were noted in the appraisal, one of which was that Maier had failed to complete six projects by their due date. *See id.* Maier was then given timetables by which to complete those projects, among other things. *See id.*

Maier also was told in the appraisal that his "progress on each of the preceding steps will be on a regular basis. His overall progress will be reviewed in detail every four weeks for an indefinite period. [Maier]'s continued employment at the Credit

---

**1.** Cassidy, who wrote the Performance Evaluation, notes after approximately three months in his new position that Cassidy believes Maier "possess[es] the intelligence and enthusiasm to perform his duties quite well." Cassidy does warn that he wants Maier to work on "the refinement and further development of his interpersonal skills" and that Maier's "'people' skills should become increasingly more developed."

Union will be evaluated based upon the satisfactory execution of his duties for as long as the review period lasts." *Id.* Maier was discharged on May 4, 1990, prior to the last day he had been given for completing some of the steps set forth in the April performance appraisal.

The Credit Union states that it fired Maier because of his credibility problem with the other managers; because of Maier's incompetence as an administrator; and because of the Administrative Services Department was "literally falling apart and he [Maier] was oblivious to that fact." J. LaRosa Deposition at pp. 47–48. Furthermore, the Credit Union realized it could hire someone with far more experience and skill than Maier possessed. *Id.* at pp. 46–47. The Credit Union felt it was better to hire such a person to replace Maier. *Id.* at 47.

Maier was replaced by Richard Coyle. Coyle had over twenty-five years of management experience and was more qualified than Maier. *See* Coyle Resume. After Maier left, many changes were made that saved the Credit Union thousands of dollars, including reorganization of the facilities area that saved $100,000 a year and reduction of microfiche costs by $53,000 to $63,000. *See* J. LaRosa Deposition at pp. 48–49.

Although Anthony LaRosa had previously refused to approve Maier's discharge for over three months, and despite the earlier requests from Cassidy to terminate Maier's employment, Anthony LaRosa made the final decision to fire Maier after he had been shown the memoranda collected from division directors Fadden, Brady and Rumick. *See* A. LaRosa Deposition at p. 22. Neither John LaRosa nor Anthony LaRosa knew that Maier had Native American ancestry. *See* A. LaRosa Affidavit; J. LaRosa Affidavit.

Maier claims that he was a victim of discrimination because of his Native American ancestry. Maier states he is one-quarter Native American. *See* Maier Deposition at p. 12. He cites two specific examples of discrimination. In March 1989, Maier alleges that Cassidy hid a globe of the earth as a joke on Maier and when Maier asked Cassidy why he had done that, Cassidy said that Maier was a "token." *See id.* at p. 24. Maier also cites as an example of discriminatory conduct an alleged conversation in which Cassidy discussed a news program or article that dealt with alcoholism among Native Americans. *See id.* at p. 30. This alleged conversation was one of about a dozen Maier claims he had with Cassidy about his Native American heritage. While Maier described those alleged conversations as "friendly, kind of informative" where there was an exchange of ideas, Maier "sensed there were negative overtones from him [Cassidy]." *See id.* at pp. 27–29.

Maier asserts that the Credit Union fired him in violation of Title VII and that the Credit Union breached an implied or explicit contract of employment.

## II. Requirements to Grant Summary Judgment

Summary judgment is authorized by Federal Rule of Civil Procedure 56, which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Material" facts are those facts that might affect the outcome of the suit under the substantive law governing the claims made. An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"

in light of the burdens of proof required by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986).

As will be detailed for each count below, Maier has failed to establish the existence of any genuine issues of material fact against the Credit Union.

### III. Title VII Violation

Maier's Title VII claim is one of disparate treatment since he asserts that he "was terminated while performing his job duties satisfactorily while similar situated whites were not terminated." Complaint at ¶ 11.

 In a disparate treatment case, a plaintiff must prove the defendant had a discriminatory animus and this animus manifested itself in some action, such as dismissal or failure to promote. *See Lewis v. University of Pittsburgh,* 725 F.2d 910, 914 (3d Cir.1983), *cert. denied* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). To establish discriminatory animus, a plaintiff needs to show an intent to discriminate. This may be demonstrated by a plaintiff presenting direct evidence of the defendant's intent to discriminate or by establishing a *prima facie* case of discrimination and utilizing the shifting burden framework.

### A. *Plaintiff Cannot Establish Discrimination Through Direct Evidence*

 Maier cannot establish a direct case of discrimination by the Credit Union. "In a direct evidence case, plaintiff initially must prove 'through direct evidence that the employment decision at issue was based upon an impermissible factor.'" *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991). Such direct evidence includes evidence that, "if believed by the trier of fact, will prove the particular fact in question without relying upon inference or presumption," *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989).

No direct evidence of discriminatory intent by the Credit Union exists. The two comments by Cassidy are the only examples Maier cites of the Credit Union's discriminatory intent. One example allegedly occurred in March 1989 when Cassidy hid a globe of the earth as a joke on Maier and when Maier asked Cassidy why he had done that, Cassidy said that Maier was a token. Maier also cites as an example of discriminatory conduct an alleged conversation in which Cassidy discussed a news program or article that dealt with alcoholism among Native Americans. Although the conversation was "kind of informative," Maier "sensed there were negative overtones from him [Cassidy]." *See* Maier Deposition at pp. 27–29. Assuming Cassidy made these statements, these statement do not constitute direct evidence that Maier was fired because of his race or national origin. Cassidy's remarks do not state that Maier was to be fired because of his Native American ancestry. *See McCarthy,* 924 F.2d at 686. Nor do Cassidy's remarks prove that Maier was fired because of his race or national origin without reliance upon inference or presumption. *See Randle,* 876 F.2d at 569. This court finds that Cassidy's remarks bear no relationship to Maier's discharge.

### B. *Plaintiff Cannot Establish A Prima Facie Case of Discrimination*

 The Third Circuit has summarized the framework necessary to establish a *prima facie* disparate treatment case based upon the United States Supreme Court's opinions in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Weldon v. Kraft, Inc.,* 896 F.2d 793 (3d Cir.1990).

[T]he plaintiff has the initial burden of proving a *prima facie* case by a preponderance of the evidence, which if successful, raises the inference of unlawful discrimination. *Burdine,* 450 U.S. at 250–52 [101 S.Ct. at 1091–93].... This burden is not onerous. The plaintiff must show that he is [1] a member of a racial

minority, [2] qualified for the job from which he was discharged, and [3] that others not in the protected class were treated more favorably. *See Hankins v. Temple University*, 829 F.2d 437, 440 (3d Cir.1987).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to clearly set forth a legitimate, non-discriminatory reason for the discharge. *Burdine*, 450 U.S. at 255 [101 S.Ct. at 1095] ... A satisfactory explanation dispels the inference of discrimination arising from the plaintiff's initial evidence. *Id.* The ultimate burden of persuasion remains with the plaintiff, who then must prove by a preponderance of the evidence that the reasons asserted by the defendant were a pretext for discrimination. *Id.* at 253 [101 S.Ct. at 1093] ... This may be accomplished either directly, by showing that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the asserted reason is unworthy of credence. *Id.* at 256 [101 S.Ct. at 1095], ... The plaintiff's initial evidence may be considered by the trier of fact in making this determination. *Id.* at 255 n. 10 [101 S.Ct. at 1095 n. 10].

*Weldon*, 896 F.2d at 796–97.

Maier has failed to establish a *prima facie* case by a preponderance of the evidence. Although Maier is a member of a protected class, he did not demonstrate that he was qualified for the job of Administrative Services Manager. Plaintiff does point to one other employee, William Denney, a white male, who was not terminated for poor performance in financial and operations areas, but rather was offered a demotion from his position as Chief Financial Officer. Even assuming that Denney, a Credit Union employee who belong to an unprotected class and was more favorably treated, was similarly situated, Maier still fails to demonstrate he was qualified.

Assuming that Maier had met this first level, the Credit Union has demonstrated that it had a legitimate, non-discriminatory reason for terminating Maier's employment. Toward the end of February 1990,

Cassidy noted that Maier was not performing his job well and wanted Maier fired at that point. In addition, various directors of the departments for which Maier was responsible documented the problems concerning Maier's performance. An appraisal of Maier's job performance was prepared on April 13, 1990, based upon these documents. The performance appraisal indicates Maier's lack of interpersonal and managerial skills and his inability to complete tasks for which he was responsible. A combination of these factors had led to a complete absence of credibility within the organization. It was for these reasons— and not race or national origin—that the Credit Union terminated Maier's employment.

Maier has not met his burden of establishing with specific facts which if credited by a trier of fact would show by a preponderance of the evidence that the alleged reasons proffered by the Credit Union are pretextual. *See Weldon*, 896 F.2d at 796– 97. Nor has Maier presented evidence that would persuade the trier of facts that a discriminatory reason more likely motivated the Credit Union or that its proffered reason is unworthy of credence. *Id.* As discussed previously, the only evidence that Maier offers of discriminatory intent are the two comments made by Cassidy. These comments, however, do not deal with Maier's employment. Furthermore, at the time of Maier's discharge, Cassidy had already been replaced by John LaRosa as Maier's immediate supervisor. To terminate Maier's employment, John LaRosa needed Anthony LaRosa's approval. Neither John LaRosa nor Anthony LaRosa knew about Maier's Native American ancestry. *See* J. LaRosa Affidavit; A. LaRosa Affidavit. Maier cannot show any basis for a claim of pretext upon which would ultimately be his burden at trial. Therefore, this court finds that summary judgment in favor of the Defendant Credit Union is appropriate.

IV. Breach of Contract Claim

Count VI of the complaint alleges that the Credit Union breached its implied or explicit contract of employment with Maier.

**332**

Maier was an employee-at-will. His employment application makes clear on the last page that the Credit Union "reserves that right to terminate [his] employment at any time, with or without cause and without prior notice." *See* Application. In addition, page one of the Personnel Policies and Employee Benefits Manual, a copy of which Maier acknowledged he had received and read, indicates that Maier was an employee "at will" who could be fired "at any time and for any reason." *See* Manual.

■ Pennsylvania law presumes that all employment is at-will employment unless the employee is able to prove otherwise. *See Rutherfoord v. Presbyterian–University Hospital*, 417 Pa.Super. 316, 612 A.2d 500, 503 (1992). Maier attempts to defeat this presumption by stating that the performance appraisal constituted a contract of employment. The performance appraisal indicated that Maier's "progress on each of the preceding steps will be on a regular basis. His overall progress will be reviewed in detail every four weeks for an indefinite period. [Maier]'s continued employment at the Credit Union will be evaluated based upon the satisfactory execution of his duties for as long as the review period lasts." *See* April 1990 Performance Appraisal.

■ Under Pennsylvania law, however, Maier's attempt fails. The Pennsylvania courts had established that "[t]he at-will employment presumption will be overcome only if the employee can show with clarity and specificity that the parties contracted for a definite period." *DiBonaventura v. Consolidated Rail Corp.*, 372 Pa.Super. 420, 424, 539 A.2d 865 (1988). The language in the performance appraisal cited *supra* does not overcome the at-will employment presumption. The Superior Court of Pennsylvania has stated that "terms such as employment will continue so long as performance is satisfactory are too ambiguous to overcome the presumption." *Darlington v. General Elec.*, 350 Pa.Super. 183, 196, 504 A.2d 306 (1986).

Since the performance appraisal does not, under Pennsylvania law, overcome the at-will employment presumption, Maier cannot establish a breach of contract as there was no contract between the parties. Therefore, this court dismisses Plaintiff's breach of contract claim with prejudice.

This court finds that all of Plaintiff's claims are dismissed with prejudice and judgment shall be entered in favor of the Defendant.