2001 OK 94

Arthur BARKER; Gary Bova; Linda Foreman; James Gaston; Anne Livingston; Carla Snipes and Greg Valley, Plaintiffs/Appellants,

and

Kathy Ault; Eugenia Beal; Janice Carter; Linda Childers; Michelin Delier; Jerry Hatley; Anne Pittman; Gary Sleeper and Sherry Walker, Plaintiffs,

v.

STATE INSURANCE FUND, Defendant/Appellee.

No. 93,154.

Supreme Court of Oklahoma.

Nov. 6, 2001.

As Corrected Nov. 7, 2001.

E.W. Keller, Oklahoma City, OK, for Appellants.

Mark S. Edmondson, Oklahoma City, OK, for Appellant Linda Foreman.

Thomas E. Prince and Aaron D. Gwartney, Edmond, OK; and Lee Slater, Oklahoma City, for Appellee.

BOUDREAU, Justice:

¶ 1 The State Insurance Fund (SIF) is an entity created by statute to, among other things, provide workers' compensation insurance to employers, state agencies and other state political subdivisions. *85 O.S. Supp. 1999, §§ 131*–151. SIF is supervised by a Board of Managers and is administered by a Commissioner. Terry Tyree (Tyree) was SIF's acting Commissioner at all times relevant to this case.

¶ 2 In early 1996, SIF commissioned Alexander & Alexander (A & A), a consulting firm, to recommend a plan that would allow SIF to provide state of the art services and keep pace with contemporary industry standards. One of SIF's objectives was to expand its practice of outsourcing claim files—that is, to refer more of its claim files to outside claims administrators (third party administrators, or TPAs) for handling and case resolution. In April of 1996, A & A made its recommendations. A & A recommended a plan for outsourcing claim files, recommended that SIF reorganize its claims and legal divisions and recommended that SIF conduct a reduction in force (RIF). The Board of Managers approved the recommendations.

¶ 3 John Yoder (Yoder), an A & A employee, was instrumental in assisting Tyree in the implementation of A & A's recommended changes during the spring of 1996. Ulti-

mately, in June of 1996, SIF completed the implementation by conducting two RIFs affecting a total of 145 positions: 89 in the claims division, 54 in the legal division and two in the policyholders division.

¶ 4 Appellants Gary Bova, Linda Foreman, Carla Snipes and Greg Valley were among the employees who lost their jobs in the RIFs. They are the only appellants who sought certiorari review concerning the entry of summary judgment in favor of SIF on their wrongful discharge claims. These four, along with appellants Arthur Barker, James Gaston and Anne Livingston, also sought certiorari review concerning the federal district court's dismissal of their blacklisting claims.[1]

¶ 5 Two issues are presented on certiorari: (1) whether appellants' blacklisting claims may be re-litigated in state court after having been dismissed by the federal court and (2) whether the entry of summary judgment was proper against Bova, Foreman, Snipes and Valley on their wrongful discharge claims.

## I. STANDARD OF REVIEW

■ ¶ 6 Whether the doctrine of claim preclusion prevents appellants from re-litigating their state claims is usually a mixed question of law and fact. "[A] deferential standard of review applies to resolutions of disputed facts when supported by reasonable evidence; an independent judgment standard of review applies to the ultimate conclusion that these facts do or do not trigger preclusion." *AJ Bayless v. Industrial Commission of Arizona*, 179 Ariz. 434, 880 P.2d 654, 659 (App.1993). Here, since the underlying facts

are not disputed, the question is solely one of law which we review *de novo. Id.*

■ ¶ 7 Whether summary judgment was properly entered is question of law which we review *de novo. Manley v. Brown*, 1999 OK 79, 989 P.2d 448, 455. In a *de novo* review, we have plenary, independent and non-deferential authority to determine whether the trial court erred in its application of the law and whether there is any genuine issue of material fact. *Kluver v. Weatherford Hospital Authority*, 1993 OK 85, 859 P.2d 1081, 1084. Like the trial court, we examine the pleadings and summary judgment evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact. We view the facts and all reasonable inferences arising therefrom in the light most favorable to the non-moving party. *Fehring v. State Insurance Fund*, 2001 OK 11, ¶ 3, 19 P.3d 276.

## II. DISCUSSION

### A. *Blacklisting Claims*

¶ 8 All seven appellants testified that after they were discharged, SIF blacklisted them, preventing them from obtaining employment with anyone that received claim files through SIF's outsourcing program. Before we address the merits of the blacklisting claims, however, we must determine whether appellants may re-litigate these claims in state court after litigating them in federal court.

■ ¶ 9 The procedural history of this case is unusual. It began in state court. Appellants asserted two state law claims (wrongful discharge and blacklisting) and one federal law claim (age discrimination). SIF

---

1. After the state trial court entered summary judgment in favor of SIF, plaintiffs appealed. With respect to the wrongful discharge claims, the Court of Civil Appeals reversed as to three plaintiffs, Jerry Hatley, Anne Pittman and Gary Sleeper, concluding that the entry of summary judgment was premature as to them. SIF did not seek certiorari review and therefore the wrongful discharge claims of Hatley, Pittman and Sleeper are not before us. The Court of Civil Appeals affirmed the entry of summary judgment on the wrongful discharge claims of the remaining appellants. Eight of those appellants were named in the body of the petition for certiorari: Arthur Barker, Gary Bova, Michelin

DeLier (who subsequently dismissed her appeal), Linda Foreman, James Gaston, Anne Livingston, Carla Snipes and Greg Valley. However, in the Combined Brief in Chief of Appellants, filed with leave of Court on July 12, 2001, appellants state that only four of the appellants sought certiorari review of their wrongful discharge claims—Bova, Foreman, Snipes and Valley. Accordingly, we limit our review of the wrongful discharge claims to those four appellants. Apparently all seven of the appellants (the eight who were named in the body of the petition for certiorari, excluding De-Lier) seek certiorari review of the dismissal of their blacklisting claims.

removed the action to federal court. The federal district court dismissed the blacklisting claims on the merits.[2] Some months later, the federal district court granted summary judgment in favor of SIF on plaintiffs' age discrimination claims. Since at that time the only remaining claims were plaintiffs' wrongful discharge claims, the federal district court declined to continue to exercise its supplemental jurisdiction and remanded the wrongful discharge claims to state court pursuant to 28 U.S.C. § 1367(c). Plaintiffs did not appeal from the federal district court's orders. The question is whether, once the case was remanded to state court, plaintiffs could continue to litigate their blacklisting claims.

■ ¶ 10 We apply federal law to determine the finality of the federal district court's orders. As a matter of right, an aggrieved party can appeal a "final decision" of a federal district court. 28 U.S.C. § 1291. This statute forms the basis for the so-called "final order" rule. Under Rule 54(b) of the Federal Rules of Civil Procedure, a "final order" is an order disposing of all claims involving all parties. An order disposing of some claims, or even one disposing of all claims involving fewer than all the parties, is not a final order. *Id.*

■ ¶ 11 Since the age discrimination claims and wrongful discharge claims were still pending when the federal district court dismissed the blacklisting claims, the order dismissing the blacklisting claims was a nonappealable interlocutory order when it was entered on December 8, 1997. However, the federal district court's March 15, 1999, order resolving the age discrimination claims and remanding the wrongful discharge claims to state court ended the litigation before the federal court.[3] Upon the entry of the remand order, the previously entered interlocutory order dismissing the blacklisting claims became an appealable final order. *Carr v. American Red Cross,* 17 F.3d 671, 678 (3d Cir.1994). Plaintiffs did not appeal.

¶ 12 In its summary judgment motion after remand, SIF argued that the federal district court's dismissal of the blacklisting claims precludes plaintiffs from re-litigating those claims. We agree.

■ ¶ 13 The doctrine of claim preclusion operates to bar re-litigation of issues that were litigated in a court of competent jurisdiction to a final judgment on the merits. *Erwin v. Frazier,* 1989 OK 95, 786 P.2d 61. The doctrine requires an identity of subject matter, of the parties or their privies, of the capacity of the parties and of the cause of action. *Carris v. John R. Thomas & Assoc., P.C.,* 1995 OK 33, 896 P.2d 522, 527. Here, because all the elements are met with respect to plaintiffs' blacklisting claims, the doctrine of claim preclusion prevents appellants from re-litigating their blacklisting claims in state court.[4]

## B.

### *Wrongful Discharge Claims*

■ ¶ 14 We now consider appellants' wrongful discharge claims. The doctrine of

---

2. In order for claim preclusion to apply, a dismissal must have been on the merits. *See Salazar v. City of Oklahoma City,* 1999 OK 20 ¶ 18, 976 P.2d 1056, 1063. In this case, the dismissal was on the merits. The federal district court dismissed the blacklisting claims for failure to state a claim, finding that an element of blacklisting is malicious intent and a state employee who acts with malicious intent cannot be acting within the scope of employment as defined in the Oklahoma Governmental Tort Claims Act.

3. The discretionary remand order itself was an appealable order. *Hyde Park Co. v. Santa Fe City Council,* 226 F.3d 1207, 1209 (10th Cir.2000); *Dalrymple v. Grand River Dam Authority,* 145 F.3d 1180, 1185 (10th Cir.1998); *see also* 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3740 (3d ed.1998).

4. We pause here, briefly, to note that in their Combined Brief in Chief appellants seem to attempt to change the nature of the their blacklisting claims to claims for wrongful discharge in violation of a public policy against blacklisting. If that is appellants' intent, the attempt is to no avail for two reasons. First, the doctrine of claim preclusion precludes re-litigation not only of the claim previously litigated but also of any claims that should have been raised in the prior action. *In re Estate of Sneed v. Jestes,* 1998 OK 8, 953 P.2d 1111. Second, all of the alleged blacklisting conduct occurred after appellants were discharged. The tort of wrongful discharge in violation of public policy does not make actionable an employer's conduct that occurred subsequent to the employee's discharge.

employment-at-will is firmly embedded in the common law of Oklahoma. *Collier v. Insignia Financial Group,* 1999 OK 49, 981 P.2d 321, 323. In 1989 we created a narrow exception to the employment-at-will doctrine— the public policy exception. *Burk v. K–Mart,* 1989 OK 22, 770 P.2d 24. We held that an employee who is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy may bring a tort claim for wrongful discharge. *Id.* We cautioned, however, that the *Burk* tort is unique: it applies to only a narrow class of cases and it must be tightly circumscribed. *Id.; Clinton,* 2001 OK 52, 29 P.3d 543, 545. To prevail on a claim of wrongful discharge in violation of Oklahoma's public policy, a plaintiff must first identify an Oklahoma public policy goal that is well established, clear and compelling and articulated in existing constitutional, statutory or jurisprudential law. *Clinton,* 29 P.3d at 546. In addition, plaintiff must prove he or she was an at-will employee, that he or she was actually or constructively discharged from employment and that the employer's discharge decision violated the articulated public policy. *Id.* The identified public policy "must truly be public, rather than merely private or proprietary." *Hayes v. Eateries, Inc.,* 1995 OK 108, 905 P.2d 778, 786.

### 1.

Oklahoma law protects both internal and external whistle-blowers who establish a sufficient public policy violation from retaliatory discharge.

 ¶ 15 In this case, appellants allege they were wrongfully discharged in retaliation for whistle-blowing. Two of our leading cases dealing with whistle-blowing are *Vannerson v. Board of Regents of the University of Oklahoma,* 1989 OK 125, 784 P.2d 1053, which we decided shortly after we created the *Burk* tort, and *Hayes v. Eateries, Inc.,* 1995 OK 108, 905 P.2d 778. In *Vannerson,* plaintiff was fired after reporting discrepancies in the university warehouse inventory records. Months earlier he had reported seeing a university employee transfer two boxes of floor tiles to a non-employee. We

held that a university policy in favor of keeping accurate inventory records did not rise to the level of an established and well-defined state public policy. With respect to the floor tiles incident, however, we held that "if [plaintiff] was in fact discharged for going over his supervisor's head in complaint of an illegal disposition of state property then public policy is invoked." *Vannerson,* 784 P.2d at 1055. Five years later, in *Hayes,* plaintiff was fired shortly after accusing his manager of embezzling from their employer. We held that Mr. Hayes was not protected from retaliatory discharge for whistle-blowing regardless whether he reported the alleged wrongdoing internally or externally, because the alleged wrongdoing did not rise to the level of clear and compelling public policy. Some have interpreted our language in *Vannerson* and *Hayes* as creating a distinction between whistle-blowers who complain within the employing organization (internal reporting) and those who complain outside the organization (external reporting).

¶ 16 Today we take the opportunity to address the issue. First, one of the primary goals of protecting whistle-blowers from retaliatory discharge is to reduce wrongdoing in a speedy, efficacious manner. In that respect, it makes sense to recognize claims of whistle-blowers who report wrongdoing within the employing organization to a person in a position to investigate and remedy the wrongdoing. Second, internal disclosures are much less disruptive to the company than external disclosures. "[L]oyal employees, who do not go outside their organizations, should not have less protection than employees who could be considered more disruptive by complaining outside their organizations." Daniel P. Westman, Whistleblowing: The Law of Retaliatory Discharge, at 114 (1991). Oklahoma law protects both internal and external reporting of whistle-blowers who establish a sufficient public policy violation from retaliatory discharge.

### 2.

Appellants failed to articulate an established and well-defined public policy that SIF violated by discharging them.

¶ 17 The fundamental problem in all public policy cases is defining what is a specific,

well-established, clear and compelling public policy. In whistle-blower cases, the answer to this question determines the subjects about which a whistle-blower may or may not legitimately complain. The nature of this problem was aptly described by the Connecticut Supreme Court when it said "[t]he issue then becomes the familiar common law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy that are actionable and ordinary disputes between employee and employer that are not." *Sheets v. Teddy's Frosted Foods,* 179 Conn. 471, 427 A.2d 385, 387–88 (1980).

¶ 18 In this case, the subjects about which appellants Bova, Foreman, Snipes and Valley complained related to SIF's implementation of the changes recommended by A & A. When they learned about the upcoming changes, they and others who are not appellants began to express concerns among their co-workers and to management. They continued to express their concerns throughout the implementation of the changes at SIF.

¶ 19 Specifically, Bova, an attorney who had a close working relationship with Tyree and considered him a friend, testified that he spoke informally with Tyree several times— once for two hours in Tyree's office after work. Bova told Tyree about his concerns about job security in light of the upcoming reorganization, about heavy caseloads, about using outside counsel to handle some of the caseload and about Yoder's role at SIF. He had heard that Yoder might be taking, or planning to take, kickbacks from some of the TPAs, but he did not talk to Tyree about it because he assumed Tyree already knew.

¶ 20 Foreman, an attorney, testified she "became the memo queen" when she saw the changes occurring at SIF. In her memos she complained about the removal of personal effects from her office, about her legal assistant using her signature stamp without her knowledge, about an outside counsel retained by SIF who had offered to settle a case for less than she had offered earlier, about SIF's private investigators who contacted a claimant even though they knew the claimant was represented by counsel, and about her request to attend continuing legal education not being promptly acted upon. She told her supervisor (and believes she also told Tyree) that she thought political favors were involved in the outsourcing of files.

¶ 21 Snipes, an attorney, testified she was suspicious about what was going on at SIF. She wanted to voice complaints to the Board and to "people that could take action and do something" but felt she could not. She testified that she voiced "whines and complaints" to her co-workers, family and friends.

¶ 22 Valley, a medical analyst, testified he told Tyree that a vendor had told him that Yoder was soliciting kickbacks from the TPAs and was asking for money "up front." Shortly after that, Valley's job duties were severely cut back. Valley also told his supervisor that he did not believe outsourcing of files was cost effective.

¶ 23 Courts have not recognized tort claims for whistle-blowers whose complaints are based upon personal opinions about the way an organization is managed. *See, e.g. Rossi v. The Pennsylvania State Univ.,* 340 Pa.Super. 39, 489 A.2d 828 (1985) (plaintiff reported mismanagement); *Dicomes v. Washington,* 113 Wash.2d 612, 782 P.2d 1002 (1989) (*en banc*) (plaintiff reported that her superiors failed to include surplus funds in the budget presented to management); *Smith–Pfeffer v. Superintendent, Fernald School,* 404 Mass. 145, 533 N.E.2d 1368 (1989) (plaintiff complained about organizational changes and policies developed by superintendent); *Bourque v. Town of Bow,* 736 F.Supp. 398 (D.N.H.1990) (plaintiff complained to the town selectmen about his supervisor). The *Smith–Pfeffer* court succinctly stated the rationale for not recognizing tort claims for whistle-blowers who complain about the way an organization is managed: "How [the state institution] should be organized is a matter of opinion and of internal policy. Internal policy decisions are a matter of judgment for those entrusted with decision-making within the institution." *Smith–Pfeffer,* 533 N.E.2d at 1371. Like other jurisdictions, Oklahoma does not recognize a *Burk* tort for public employees who complain about the way an organization is managed when the complaints merely exhibit differences of opinion or dissatisfaction with

discretionary management decisions and the like. Something more is required such as reporting fraudulent activity or criminal misuse of funds.

¶ 24 *Burk*, which holds that termination of an at-will employee in contravention of a clear mandate of public policy is a common law tort, fashions the parameters of an exception to the general at-will-employment doctrine. *Gunn v. Consolidated Rural Water & Sewer District*, 1992 OK 131, 839 P.2d 1345. Although the *Burk* tort is firmly rooted in the common law, our cases recognize that the clear mandate of public policy may be articulated by a state statute. *Burk*, 770 P.2d at 28. However, not every statute sets forth a mandate of public policy upon which a *Burk* tort may be based. *See, e.g., Griffin v. Mullinix*, 1997 OK 120, 947 P.2d 177 (Oklahoma's Occupational and Safety Standards Act, *40 O.S.1991, §§ 401 et seq.*, does not support a common law *Burk* tort). Unless a statute specifically articulates an *established and well-defined* Oklahoma public policy, the statute may not be relied upon to support a common law *Burk* tort. *Burk*, 770 P.2d at 29.

¶ 25 We reject appellants' claim that an *established and well-defined* public policy against discharging an employee for reporting mismanagement can be found in our whistle-blower statute, *74 O.S. Supp. 1995, § 840–2.5.* That statute provides that a public employee who has been disciplined for, among other things, "reporting . . . mismanagement," may file an appeal with the Oklahoma Merit Protection Commission within 60 days of the alleged disciplinary action. *Id.* at § 840–2.5(A)(2), (E). If, after investigation and hearing, it is determined that a violation of section 840–2.5 has occurred, the Commissioner or hearing examiner shall order corrective action pursuant to *74 O.S. Supp.1995, § 840–6.6.* While this statute provides limited protection for public employees who are disciplined for reporting mismanagement, it does not define the term "mismanagement." Because the statute leaves the parameters of mismanagement undefined, mismanagement is an amorphous term that includes essentially any decision of an employer that is challenged by an employee with a different opinion about the way an organization should be managed. The term falls short of being sufficiently specific and clear for purposes of articulating an established and well-defined public policy against discharging employees for reporting mismanagement. The statute cannot support a *Burk* tort.[5]

¶ 26 Appellants also point to *85 O.S. 1991, § 138.2* as a source of the public policy SIF allegedly violated by discharging them in the RIFs. Section 138.2 defines who is a fiduciary with respect to SIF and sets forth the powers and duties of such fiduciaries. According to appellants, section 138.2 imposes on them a fiduciary duty to act in the best interest of SIF's policyholders. Since their expressions of concern were in the best interest of the policyholders, they continue, SIF's discharge of them violated Oklahoma public policy. We disagree. Section 138.2 does not articulate a specific, well established, clear and compelling Oklahoma public policy in favor of encouraging SIF employees to complain about the way SIF is managed.[6]

5. A person harmed by a violation of the whistle-blower statute might contend that the statute creates an implied right of action and seek to press a statute-based tort claim. Because appellants did not pursue such a theory in their appeal, we need not decide the issue.

6. The dissent offers two alternative sources of public policy that were not urged by appellants: the Anti Kickback Act of 1974, *74 O.S.1991 §§ 3401 et seq.* and the Oklahoma Central Purchasing Act, *74 O.S.1998 §§ 85.1 et seq.* While the Anti Kickback Act may indeed be an adequate source of public policy to support a *Burk* whistle-blower tort, none of the four appellants made an adequate report about kickbacks. There is no evidence in the summary judgment record that Foreman or Snipes made any report at all about kickbacks. The dissent itself concedes that Bova did not report any allegations of graft or kickbacks since he assumed Tyree already knew. Dissent at ¶ 9. And, although Valley told Tyree he had heard a rumor that Yoder was taking kickbacks, Valley admitted he had no idea if the rumor was true. Our decision, at paragraph ¶ 31, concludes that Valley's unsubstantiated rumor is not the type of report that is protected by the whistle-blower strand of the *Burk* tort.

The dissent also identifies the Central Purchasing Act as a source of public policy. We need not decide whether this is a sufficient source of public policy because there is no evidence that any of the four appellants made any report at all

¶ 27 The summary judgment evidentiary materials in this case shows that Bova, Foreman, Snipes and Valley seriously disagreed with SIF's management. They disagreed with the manner in which Tyree and Yoder conducted the outsourcing of SIF claim files, the reorganization of SIF's claims and legal divisions and the two RIFs. They expressed concerns about whether the outsourcing program would be cost effective and they questioned Yoder's role in the implementation of the recommendations. At least one, Foreman, reported that she believed the outsourcing program involved political favors. However, even when viewing the summary judgment evidentiary materials in the light most favorable to appellants, we find they have failed to tie their expressions of concern to a specific, well established, clear and compelling Oklahoma public policy that appellants sought to correct by their actions and that SIF violated by discharging appellants in the RIFs. *Vannerson,* 784 P.2d at 1055. Instead, we find that their expressions of concern are similar to the complaints voiced by the plaintiffs in *Rossi, Dicomes, Smith–Pfeffer* and *Bourque* (with one exception we address below).

¶ 28 The one incident that comes closer to satisfying the *Vannerson* test is Valley's report to Tyree that he, Valley, had been told by a vendor that Yoder was soliciting kickbacks from the TPAs. However, it is unnecessary for us to determine whether the subject matter of Valley's report implicates a sufficient state public policy because we find Valley's report insufficient for a different reason.

¶ 29 Valley described his report to Tyree as follows:

I had told him that I got a call from a vendor that informed me that Mr. Yoder was soliciting kickbacks. He says when did this happen, and I said it just happened yesterday, because I just got the call the day before. And I had called that day, but I couldn't get in to see him, so then I saw him the next day, because I was working half days. *And I told him, I says, you know, I don't know if there's truth to it or not, but I thought I should let you*

*know just to make sure.* And he says I'll look into it. And that was pretty much the extent of the conversation. Mr. Tyree didn't talk to me a whole lot. (emphasis added).

 ¶ 30 Our research has not revealed a single jurisdiction that recognizes a tort claim for whistle-blowers who report a rumor of wrongdoing when they have no idea if the rumor is true. There is no "rumor spreader exception" to the employment-at-will doctrine. *See Lawson v. AK Steel Corp.,* 94 Ohio Misc.2d 65, 703 N.E.2d 371, 373 (Com.. Pl.1998).

¶ 31 Without deciding whether a whistle-blower must have direct personal knowledge of the reported wrongdoing or instead must have only an objectively good faith belief that the reported wrongdoing has occurred, we reject any notion that Valley's report of the rumor he heard is the type of report protected by the whistle-blower strand of the *Burk* tort. *See, e.g., Read v. City of Lynwood,* 173 Cal.App.3d 437, 219 Cal.Rptr. 26 (1985) (plaintiff reported rumor that a city contractor had attempted to bribe a city employee— insufficient to support whistle-blower claim); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988) (plaintiff reported rumor that FBI was investigating his new supervisor for embezzlement-insufficient to support whistle-blower claim).

## III. CONCLUSION

¶ 32 Under the doctrine of claim preclusion, the blacklisting claims of appellants Barker, Bova, Foreman, Gaston, Livingston, Snipes and Valley cannot be re-litigated in state court because those claims were litigated to finality in the federal district court. The wrongful discharge claims of appellants Bova, Foreman, Snipes and Valley cannot survive summary judgment because appellants' summary judgment evidentiary materials are not sufficient to create a genuine issue of material fact as to whether their complaints and other expressions of concern rise to the level of any specific, well established, clear and compelling state public poli-

concerning alleged violations of the competitive bidding process.

cy which the employee sought to correct by his or her actions.[7] The Court of Civil Appeals' ruling on the claims of appellants Hatley, Pittman and Sleeper is not before this Court on certiorari review. Accordingly, we leave undisturbed that portion of the Court of Civil Appeals' opinion remanding Hatley, Pittman and Sleeper's claims to the trial court for further proceedings. We also leave undisturbed that portion of the Court of Civil Appeals opinion relating to claims of appellants who did not seek certiorari review.

. **CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL APPEALS VACATED IN PART; COURT OF CIVIL APPEALS OPINION WITHDRAWN FROM PUBLICATION; TRIAL COURT'S SUMMARY JUDGMENT, AFFIRMED IN PART AND REVERSED IN PART.**

¶ 33 HARGRAVE, C.J., HODGES, LAVENDER, SUMMERS, BOUDREAU, WINCHESTER, JJ., concur.

¶ 34 OPALA, J., concurs in part II(A); dissents from part II(B).

¶ 35 KAUGER, J., concurs in part and dissents in part.

¶ 36 WATT, V.C.J., disqualified.

**7.** The dissent's concluding paragraph suggests there are issues of material fact as to "whether illegal kickbacks were either made or condoned and with the real possibility that public monies were not correctly marshaled through violations of the competitive bidding process." Dissent at ¶ 20. The appropriate inquiry in this controversy is not whether SIF, Tyree and Yoder were engaged in taking kickbacks and violations of the competitive bidding process. We may assume for purposes of summary judgment that they were. The appropriate inquiry is, instead, whether appellants *reported* kickbacks and violations of the competitive bidding process which reports resulted in their discharges. The record on summary judgment reveals that they did not.

**1.** Title 74 O.S. Supp.1997 § 840–2.5 provides in pertinent part:

"A. For purposes of this section, 'agency' means any office, department, commission or institution of the state government. No officer or employee of any state agency shall prohibit or take disciplinary action against employees of such agency, whether subject to the provisions of the Merit System or in unclassified service, for:

KAUGER, J., with whom OPALA, J. joins, concurring in part and dissenting in part:

¶ 1 I agree with the majority's resolution of the blacklisting claims and that both internal and external whistle-blowers establishing public policy violations should be protected from retaliatory discharge. Nevertheless, I dissent from the portion of the opinion indicating that the plaintiffs/appellants, Gary Bova (Bova), Linda Foreman (Foreman), Carla Snipes (Snipes) and Greg Valley (Valley) (collectively, employees), failed to articulate any well-defined public policy violation in support of their wrongful termination claims.

¶ 2 *What the Court describes as appropriate issues in the case represents a flawed analysis of the employees' claims. What the employees need to prove is that they were discharged because they were present or potential whistle blowers for the agency's mismanagement.* This cause involves much more than mere complaints voiced around the water cooler about the defendant/appellee's, State Insurance Fund (Fund), internal managerial operations or style. Rather, important, statutorily based, public policy mandates are at issue—identified in the whistle blower statute, 74 *O.S. Supp.1997* § 840–2.5[1] and whose genesis arises from other statutory prohibitions.[2]

1. Disclosing public information;
2. Reporting any violation of state or federal law, rule or policy; mismanagement; a gross waste of public funds; an abuse of authority; or a substantial and specific danger to public health or safety;
3. Reporting such information without giving prior notice to the employee's supervisor or anyone else in the employee's chain of command;
4. Discussing the operations and functions of the agency, either specifically or generally, with the Governor, members of the Legislature or others...."

Because the language quoted is identical to that contained in the statute's 1995 counterpart, references are to the current statute.

**2.** See, the Anti–Kickback Act of 1974, 74 *O.S. 1991* § 3401 et seq. Specifically, 74 *O.S. Supp. 1999* § 3404 providing:

"Any person who shall knowingly make or receive, either directly or indirectly a kickback shall be guilty of a felony, and upon conviction shall be fined not more than Ten Thousand Dollars ($10,000.00) or double the amount of

¶ 3 Specifically, material fact questions exist concerning: 1) whether the defendant/appellee's, State Insurance Fund (Fund), Commissioner condoned the payment of kickbacks in return for the services of John Yoder (Yoder), an individual characterized as an employee of a third party administrator (TPA), in violation of the Anti–Kickback Act of 1974, *74 O.S.1991 § 3401 et seq;* and 2) whether state contracts were let for legal services in violation of the Oklahoma Central Purchasing Act, *70 O.S.1991 § 3401 et seq.* Further, material questions of fact also exist as to: 1) whether the employees actually reported wrongdoing; or, 2) if they did not, whether the Commissioner or other Fund supervisors prohibited the Fund employees from: a) making public disclosure without prior approval; or b) discussing the Fund's operations with the elected representatives in violation of the whistle-blower statute.

¶ 4 Here, the employees allege that there were activities at the Fund which violated public policy and which were done in an illegal manner. Under such circumstances, this Court may resolve a public policy issue neither advanced below nor on appeal.[3] We take judicial notice of public policy established through statutory enactments.[4] Whether the Fund operated against public policy presents a controversy that we may resolve on a theory supported by the record although not tendered on certiorari.[5] Rather than doing so, the majority emasculates the whistle blower statute and ignores statutorily-based public policy issues prohibiting kickbacks[6] and the letting of contracts without

the financial gain or be imprisoned for not more than five (5) years, or both."
The language of the quoted statute is identical to that of it's 1991 counterpart. Therefore, references are to the current statute.
See, the Oklahoma Central Purchasing Act, *74 O.S.1991 § 85.1 et seq.* Specifically, *74 O.S. Supp.1996–85.7* providing in pertinent part:
"A. No acquisition or contract shall be made without the submission of competitive bids by the State Purchasing Director, except as provided in this section.
1. Any acquisition or contract for an amount of Two Thousand Five Hundred Dollars ($2,500.00) or less shall be exempted from competitive bidding procedures. Separate contracts or acquisitions for the individual components of a total project or service or split purchasing for the purpose of evading the requirement of competitive bidding shall be deemed a felony...."
We note that the current version of the statute contains a cap of $25,000.00 as opposed to the $2,500.00 cap imposed in its 1996 counterpart. Title *74 O.S.1991 § 85.15* provides:
"All persons, agents, officers and employees of the state included within the provisions of this act are required to conform strictly to the provisions of this act, and any such persons, agents, officers or employees violating any provision of this act shall be deemed guilty of a misdemeanor unless herein otherwise provided, and upon conviction shall be fined not less than One Hundred Dollars ($100.00) nor more than Five Hundred Dollars ($500.00) or be imprisoned in the county jail not to exceed six (6) months or by both such fine and imprisonment."
Further, employees were prohibited from freely expressing their opinions—a constitutionally protected right. The United States Const., amend. 1 provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
The Okla. Const., art. 2, § 22 provides:
"Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted."

3. *Davis v. GHS Health Maintenance Organ., Inc.,* 2001 OK 3, ¶ 25, 22 P.3d 1204; *In re Initiative Petition No. 349,* 1992 OK 122, ¶ 4, 838 P.2d 1; *Matter of McNeely,* 1987 OK 19, ¶ 4, 734 P.2d 1294.

4. Title *12 O.S.1991 § 2201* provides in pertinent part:
"A. Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States...."
*Davis v. GHS Health Maintenance Organ., Inc.,* see note 3, supra.

5. *Russell v. Board of County Commissioners,* 1997 OK 80, ¶ 10, 952 P.2d 492.

6. Title *74 O.S. Supp.1999 § 3404,* see note 2, supra.

the protection of the competitive bidding process.[7]

¶5 Whistle blower statutes are legislative expressions intended to encourage and protect the reporting of wrongful governmental activities and to effectively deter retaliation for such reporting. They provide redress for damages suffered as a consequence of the specific use of official power to limit a particular protected activity—the proper reporting of on-the-job or job-related wrongful actions.[8] Oklahoma's whistle blower statute not only prohibits disciplinary actions for protected employee reporting activities, it also restricts managers from denying employees the opportunity to discuss agency operations and functions with their elected representatives.[9] Such directives have been determined to be unenforceable under similar statutory provisions.[10]

¶6 Although the majority characterizes the cause as a controversy over questions of managerial style, there is much more alleged here—criminal wrongdoing in the form of condoning kickbacks for services rendered to the Fund and the Fund's letting of state contracts outside the competitive bidding process. The materials, taken together, are certainly sufficient to raise a question in a reasonable person's mind about whether illegalities were occurring with public monies and whether discharges occurred because

Fund employees reported the alleged wrongdoing.

¶7 The Anti–Kickback Act, 74 O.S.1991 § 3401 et seq., prohibits monetary incentives for the obtaining of state contracts to any state employee or any person holding a higher tier contract with the state for the purpose of maintaining the contractual relationship.[11] A party making or receiving a kickback, directly or indirectly, is guilty of a felony and may face a fine of $10,000 or double the amount of the financial gain and be imprisoned for up to five years.[12]

¶8 The Oklahoma Central Purchasing Act (Purchasing Act), 74 O.S. Supp.1998 § 85.1 et seq., has been amended since the occurrences involved here. During the period the Fund was undergoing its reorganization, the Purchasing Act mandated that any acquisition or contract in excess or $2,500.00 could not be completed without the State Purchasing Director submitting competitive bids.[13] Parties violating the Purchasing Act are guilty of a misdemeanor and subject to a fine of not less than $100.00 and not more than $500.00. In addition, violators may face a term in county jail of up to six months.[14]

¶9 Bova believed that kickbacks were occurring because of personal conversations with Yoder.[15] While Bova may not have directly reported allegations of graft or kick-

---

7. Title *74 O.S.1991 § 85.15*, see note 2, supra.

8. *Shoemaker v. Myers*, 52 Cal.3d 1, 276 Cal.Rptr. 303, 801 P.2d 1054, 1066 (1990).

9. Title 74 O.S. Supp.1997 § 840–2.5, see note 1, supra.

10. *Lanes v. O'Brien*, 746 P.2d 1366, 1370–72 (Colo.App.1987). See also, *Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir.1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978).

11. Title *74 O.S.1991 § 3402* provides in pertinent part:
 "As used in this act:
 1. Kickback means the giving of money or any other thing of value either directly or indirectly by or on behalf of any person, or the agent of any person, holding a contract or bidding to obtain a contract with the state for the furnishing of goods or services of any kind to any state employee or any person holding a higher tier contract with the state for the furnishing of goods or services, when the giving

of which is for the purpose of acquiring or holding such contract with the state ..."
 Title *74 O.S.1991 § 3403* provides:
 "No person, holding a contract with the state for the furnishing of goods or services of any kind, shall give or offer to give a kickback to any person holding a higher tier contract with the state or to any state employee."

12. Title *74 O.S. Supp.1999 § 3404*, see note 2, supra.

13. Title *74 O.S. Supp.1996 § 85.7*, see note 2, supra.

14. Title *74 O.S.1991 § 85.15*, see note 2, supra.

15. Deposition of Gary Bova providing in pertinent part at pp. 194–95:
 "... Q My slippage in that last question reminds me. Should I—did John Yoder tell you that he was receiving money presently from the TPAs, or was he going to receive money at a later date from the TPAs?

back, he did believe the Commissioner was aware that Yoder had been accused of accepting kickbacks from TPAs in exchange for out-sourcing files either because it had been reported to him by another employee [16] or because of conversations taking place during staff meetings.[17]

¶ 10 Bova's beliefs are supported by Bradford's testimony that the Commissioner told

A No. The way John would—it was—he was kind of a cocky, condescending guy. And he— it would be like that, you know, this is small potatoes, you know, I don't even work here. I make my money from my consulting fees through these TPAs. And, you know, he never said I'm receiving money now or I'm going to receive money in the future. It's just that the way he earned his money was through the TPAs.

Q So you're unclear as to whether he was receiving money from any TPAs at the time of your conversation?

A Well, you know, I could only tell you what I assumed from what I heard.... And I assumed that he was receiving money from them.

Q And you understood that to be at the time present at the time of the conversation?

A At the time of the conversation. But, you know, I could—you know, with John, you don't know, you know. He was a bit of a bragger...."

**16.** Deposition of Gary Bova providing in pertinent part at pp. 185–86:

"... Q That's fair enough. Why didn't you tell Terry Tyree about the statements John Yoder had made to you, that he was receiving money from the third-party administrators?

A You know, I assumed he knew it.

Q What led you to assume that Mr. Tyree knew that?

A Well, based on just a brief conversation with Greg Valley in passing, you know.... But I do recall Greg saying he was going to or did have that conversation with Terry...."

**17.** Deposition of Gary Bova providing in pertinent part at p. 192:

"... Q Did you tell Elizabeth Bradford about the conversations you had with John Yoder, that he was receiving money from the third-party administrators?

A I'm sure it came up in a staff meeting...."

**18.** Deposition of Elizabeth Bradford providing in pertinent part at pp. 166–67:

"... Q Has Mr. Tyree ever told you he knew about Mr. Yoder's contracts with the TPAs?

A Yes.....

Q (By Mr. Keller) When did he tell you that, if you remember?

A We had a special meeting in December of 1996, which I believe was on a Friday. It was

her that he was aware that Yoder was getting a three percent kickback from the TPAs.[18] In addition, Valley testified that he believed he was included in the reduction in force because he reported that kickbacks were being solicited for the outsourcing of files.[19] Finally, Foreman expressed concerns that files were being referred out to private firms on a *quid pro quo* basis in return for

the following Monday, and so it would have been December 16th. And as I was leaving his office, he told me, after discussing the newspaper article that had come out about John Yoder, he told me that everybody knew about John's contracts.

Q And was that the contracts that involved him getting the 3 percent kickback from the TPAs?

THE WITNESS: I presume. That was what was in the newspaper, so that's what we had been discussing, so I—..."

**19.** Deposition of Greg A. Valley providing in pertinent part:

at p. 136 "... Q Okay. What leads you to believe that the conversation you had with Terry Tyree in January of 1996 in any way influenced the decision to include you in the reduction in force?

A All my job duties were cut back severely after that. I mean I was not to do hardly anything...."

at p. 121 "... Q To the best of your memory, please tell us everything that was said by you and Mr. Tyree in that meeting.

A I had told him that I got a call from a vendor that informed me that Mr. Yoder was soliciting kickbacks. He says when did this happen, and I said it just happened yesterday, because I just got the call the day before. And I had called that day, but I couldn't get in to see him, so then I saw him the next day, because I was working half days. And I told him, I says, you know, I don't know if there's truth to it or not, but I thought I should let you know just to make sure. And he says, you know, I don't know if there's truth to it or not, but I thought I should let you know just to make sure. And he says I'll look into it. And that was pretty much the extent of the conversation. Mr. Tyree didn't talk to me a whole lot.

... Q Did you tell Terry Tyree that Archie Anderson had used the percentage of 3 percent as the amount being requested?

A I don't know if I did nor not.

Q Did you tell Terry Tyree that Yoder had requested 2 to $3,000 up front cash money?

A I told him that he was asking for money up front...."

political favors.[20]

¶ 11 Yoder testified that he understood that, in order to get paid, the Commissioner was going to direct monies through an actuary for his benefit. Evidently, this was done to avoid the Fund having ·to engage in a competitive bidding process.[21] Yoder also indicated that some 9,000 files were outsourced to firms without a bidding process having been instigated at all.[22]

¶ 12 Bradford testified the she assumed there were files outsourced in violation of the competitive bidding statutes [23] and that more files were referred out than the State Insur-

20. Deposition of Linda S. Foreman providing in pertinent part at pp. 164–65:

"... Q What additional concerns or complaints did you voice that were not represented in the memos you brought with you today?
A I voiced concerns to Mr. Sleeper, my managing attorney, and I believe to Terry Tyree in our meeting that any reorganization—and that what I saw happening with files being outsourced to various attorneys, very specific attorneys, that there was perhaps a quid pro quo occurring.
Q And what is a quid pro quo?
A I would—it seemed as though political favors were changing hands....
Q Is it your testimony you told Mr. Tyree about this concern?
A At our first meeting I expressed concerns about the political overtones of what was occurring....
Q Would you now tell us what was said at your meeting with Terry Tyree?
A I expressed concerns about the feasibility study, I expressed concerns that feasibility does not stand on its own, I expressed concerns that the attorneys were going to be fired and that someone would benefit monetarily and politically from this activity...."

21. Sworn statement of John Yoder taken November, 27, 1996, providing in pertinent part at p. 15:

"... A and since—Well, Terry said, 'Okay. We can't pay you we can't pay the TPAs without going through an RFP and a bid process. We can pay MacLean–Oddy because they're actuaries.' And so I said, 'Fine. We'll just—we'll package the whole deal. You make the check to MacLean–Oddy. MacLean–Oddy knows what my fee is. They know what the fee is for the TPAs. That's how we'll do it.'...."

22. Sworn statement of John Yoder taken 27, 1996, providing in pertinent part:

at pp. 55–56 "... Q How many files all together, approximately?
A Nine—those three clients of mine have 9,000 files....
Q Well, how are the TPA—who's paying the TPAs?
A State Fund.
Q And did the TPAs, to get the cow bids that Terry Tyree sent out to get it done, he got you to get those people to come in and do the work for him?

A That's right. And I—I went to my three clients. I did not go to Claims Risk Services.
Q They did not bid for any of that work through a State process?
A There was never as bid. There was never an RFP written. There were never interviews. There were never contracts. There was nothing...."
at p. 79 "... Q But the work that you describe as emergency work, that Tyree came to you, that was all assigned out when? What date?
A That was assigned out beginning the—I think the second week or third week of April of '96—
Q There was no bid?
A—without bid, without RFP, without contract...."

23. Deposition of Elizabeth Bradford providing in pertinent part at pp. 126–27:

"... Q I would like to read to you a portion of Title 74, Section 85.7, as shown in the supplement.
And, quote 'A., [sic] No acquisition or contract shall be made without the submission of competitive bids by the state purchasing director except as provided in this section.
1., [sic] any acquisition or contract for an amount of $2,500 or less shall be exempted from competitive bidding procedures. Separate contracts or acquisitions for the individual components of a total project or service or split purchasing for the purpose of evading the requirement of competitive bidding shall be deemed a felony.
The state purchasing director may waive or increase the $2,500 limit up to but not to exceed a contract or purchase price of 10 percent above the open market limit to perfect an otherwise valid acquisition or contract inadvertently exceeding the $2,500 limit due to administrative error or for unforeseeable circumstances.'
... Q Did the outsourcing the cases to TPAs include them receiving fees that exceeded $2,500?
A I believe so, yes, sir.
Q Do you know how much their fees were for the first year, for example? I'm sure there's a year-end budget or expense showing how much they were paid....
THE WITNESS: I'm sure there is, but to be honest, I don't know. It would be an educated guess, based on just the number of files. I would have to assume it was in excess of $2,500...."

ance Fund's Board of Managers (Board)[24] agreed should be outsourced.[25] She also indicated that the Commissioner limited her access to materials the Board requested and that he "controlled" the information that was submitted to the Board.[26] A portion of the information Bradford alleged was withheld from the Board involved the outsourcing of files without having engaged in the competitive bidding process.[27]

¶ 13 It is clear from the record that Fund employees could attend the Board's meetings only after obtaining supervisory approval.[28] There is also testimony in the record indicating that the Commissioner issued a memorandum prohibiting Fund attorneys from communicating with legislators about the occurrences at the Fund.[29] Further, one employee testified that he was instructed to keep his complaints "within the chain of command" by the Fund's general counsel[30] while another indicated that he did not talk to the Commissioner because only two of the super-

24. The Board of Managers of the State Insurance Fund has supervision over the Fund's operations. Title *85 O.S. Supp.1996 § 131a* provides in pertinent part:

"A. There is hereby created a Board to be known as the 'Board of Managers of the State Insurance Fund', which Board shall have supervision over the administration and operation of the State Insurance Fund ..."

25. Deposition of Elizabeth Bradford providing in pertinent part at pp. 126–27:

"... Q You were aware of the minutes of the April 23, 1996 board meeting of the board of managers wherein they said that—they made a motion that passed that stated that not more than 15 percent of their cases after the transition would be outsourced. You were aware of that minute?
A Yes, sir....
Q Did they outsource more than 15 percent of the cases?
A Yes...."

26. Deposition of Elizabeth Bradford providing in pertinent part at pp. 162–63:

"... Q (By Mr. Keller) I notice that one or more of the board members of whom we've taken their deposition have indicated about—when asked about your competency, that you don't provide them information. Your answer indicates that you've been unable to get information from the State Insurance Fund that you represent.
... Q I assume you can't provide it to the board members if you're not able to get it yourself.
A That's right....
Q And what person or persons in the State Insurance Fund is refusing to give you information?
A Mr. Tyree....
Q The information you wanted, has he given that information to the board members himself?
A No, sir....
Q (By Mr. Keller) Do you believe that Mr. Tyree is trying to control what information gets to the board?
A Yes, sir, very much...."

27. Deposition of Elizabeth Bradford providing in pertinent part at p. 164:

"... Q (By Mr. Keller) Was the board ever advised at those open meetings by Mr. Tyree or anybody on his behalf that they were going to outsource a great number of contracts or cases to TPAs through a letter-type contract without any bidding?
... THE WITNESS: No, sir...."

28. Memorandum dated March 29, 1995, from Commissioner Tyree to all employees, marked as exhibit 2 to answer to the motion for summary judgment, providing in pertinent part:

"... In recognition of the Fund's heavy workloads, employees should not attend monthly meetings of the Board of Managers unless a specific request is made by the Board, the Administration or unless prior written approval for annual leave is obtained from your Division Administrator or Branch Office Manager...."

Deposition of Elizabeth Bradford providing in pertinent part at p. 59:

"... Q Were [attorneys] advised not to go to any board meetings unless they got prior permission?
A There was a directive to all State Insurance Fund employees prior to my coming on board to that effect...."

29. Deposition of Jerry Frank Hatley providing in pertinent part at p. 24:

"... Q Tell me about this memo you've referenced now twice from Commissioner Tyree.
A A memo circulated sometime early '96. I first heard about it verbally, and then I believe I remember seeing it. I'm not positive I saw it, but I believe I did. Basically saying that attorneys with the Fund should not be communicating with anyone in the state legislature about what was going on at the Fund...."

30. Deposition of James Leo Gaston, Jr. providing in pertinent part at p. 48:

"... Q Okay. When did Ms. Bradford instruct you to keep your complaints within the chain of command?
A I would say that comment was made at the second mandatory meeting that I went to...."

visory attorneys had access to him.[31] Although it is true that Snipes testified that she voiced her worries only to other employees, friends and family, she alleged that her supervisor prevented her from appearing at the Board's meeting by directing her not to attend.[32] Valley, also testified that he was prohibited from attending Board meetings on the Commissioner's instructions.[33]

¶ 14 Yoder testified that the Commissioner intentionally delayed firing the Fund's lawyers to keep them from having an opportunity to direct concerns to Senators and Representatives while the Legislature was in session.[34] Further, Yoder stated that although the Commissioner sent out letters indicating that the law firms receiving outsourced files were free to hire former Fund attorneys, he was instructed to make certain that these firms knew they were not to hire any former Fund employees. Yoder stated that the Commissioner's reason for opposing such hires was that he did not want the Fund attorneys to have access to billing records which would reflect that the Fund was paying more for legal work being outsourced than it had formerly paid for in-house counsel.[35]

**31.** Deposition of Gary Bova providing in pertinent part at p. 122:

"... Q Okay. Did you ever talk to Mr. Tyree about this?
A No, they—no, I didn't. The way they set it up, you know, the only people that were supposed to talk to Terry on those kind of things were Liz and Gary. They set up Gary as kind of a presiding guy so that Terry wouldn't have to be dealing with all of us...."

**32.** Deposition of Carla Snipes providing in pertinent part:

at pp. 70–71 "... Q Which board meeting were you not permitted to attend?
A The meeting before I was terminated. I wanted to go. I planned on going. I had information to present. I had my chart to present. And I was told I could not go. I was even willing to take my own time.
Q Who told you couldn't go?
A Well, I told Gary Sleeper what I planned on doing, and he was my immediate supervisor. And I remember—the only part—you know, I remember leaving there knowing that I could not go based upon our conversation. But I remember him shaking his head and he looked real worried and he said, no, I wouldn't do that if I were you. And he made it clear that I could not go. And I said, well, I believe I have the right to go. And I said, it's my understanding it's a public meeting and I can go. And he—and I was told I could not go. And I really, really wanted to be there...."

at pp. 86–87 "... Q Did the board members ever hear your complaints.
A I doubt it. I don't know any of the board members.
Q Did Commissioner Tyree ever hear your complaints?
A I don't believe I've ever had a conversation with Mr. Tyree ever.
Q Did Elizabeth Bradford hear your complaints?
A No.

Q Okay. So the basis of your lawsuit then is that your inability to express your complaints to management; is that true?
A Yes. My—
Q In essence, the roadblock that was put in front of you—
A Right...."

**33.** Deposition of Greg A. Valley providing in pertinent part at p. 76:

"... Q Did you ever request annual leave to attend a board meeting?
A I asked Mr. McRae about attending the board meeting, and he said that we were not to attend, period.
... Q Did he explain why? Did you ask why?
A He said according—he said Terry Tyree does not want anyone attending the board meetings, period. That's why...."

**34.** Sworn statement of John Yoder taken November 27, 1996, providing in pertinent part at p. 84:

"... A Yeah. But Tyree expressed multiple times his real concern, that if they didn't get it done right away, get that stuff done, the attorneys would have time to mobilize the legislature and get going. And he wanted the files out. He didn't want the attorneys kicked out until the legislature went back out of session.
Q So he planned on firing the lawyers after the legislature was out of session, which he did after May 1. Is that right?
A Yeah. The—the train just—Originally, the shutdown was to occur the last of May. The shutdown really has never occurred. He had hoped to delay the announcement on the legal department. And your peers can tell you all of the rumors about what was going to happen in the legal department, but it's my recollection that very little specific happened to the legal department until just about the time the legislature went out of session...."

**35.** Sworn statement of John Yoder taken 27, 1996, providing in pertinent part at pp. 88–90:

"... Q Did Tyree ever instruct you that none of the TPAs were to hire or send work out to any

¶ 15 In Oklahoma, summary judgment is proper only when the pleadings, affidavits, depositions, admissions, or other evidentiary materials establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[36] All inferences drawn from the evidentiary materials submitted to the trial court are viewed in the light most favorable to the party opposing the motion. Before a motion for summary judgment under Rule 13, 12 O.S. Supp.1993, Ch. 2, App., Rules for the District Courts, may properly be granted, the movant must show that there is no disputed issue of material fact.[37]

¶ 16 Even when basic facts are undisputed, motions for summary judgment should be denied if, under the evidence, reasonable persons might reach different conclusions.[38] Only when a party shows that there is no material fact in dispute and the law favors the movant's claim or defense should summary judgment be entered.[39] To defeat a motion for summary judgment, the nonmovant merely must present "something" showing that, at trial, there will be proof of the allegations.[40] Materials relating to summary judgment need not rise to the level of admissibility.[41]

¶ 17 The standard for summary process in the federal courts differs substantially. Federal litigants must provide more persuasive evidence to support a proffered position.[42] Trial judges are free to inquire whether a jury could reasonably find the evidence

lawyers that had previously been with the State Insurance Fund?
A Yes. In fact, he told me that he was going to send out memos to the TPAs that said, 'You're free to hire anybody you want.' But then I was to immediately personally sit down with the manager of each TPA, which I did, and tell them, 'That's what he said. This is what he wants.'
Q And what was—
A 'You don't—you don't hire Sleeper, Bova or anybody else.' Ann Pittman had wanted—We were getting calls from—from the TPAs and from various law firms wanting to hire former Fund attorneys, and he had a standard letter response. And any time that response went out, he would instruct me or instruct Beth Herron to instruct me to make sure that that TPA knew, You're [sic] not going to hire them. They are not going to work for the Fund. They are not going to work on the Fund files....
Q Did Tyree have a reason for that? Did he tell you why he did that? He just didn't want them?
A He was afraid that they would undermine the project. He was afraid that they would have—that the attorneys, former attorneys at the Fund, would, by joining a firm, be able to gain access to billing records that would prove the cost of the attorneys who were hired by the TPAs and that the cost of those attorneys would exceed the cost of having kept those—In other words, if an attorney is going to bill $75 an hour, 75 times 40 is 3,200, 3,150 a week. That would buy him for a month at the Fund. And what he was most fearful of is that one of them would come back to a board meeting or to a board member and say, I billed you 12,000 for the last quarter, or four months—or excuse me—four weeks—
Q Four weeks, yeah.
A—four weeks. You used to pay me that for three months. Where are you headed with

this, and what do you mean 'saving money?' That was his biggest fear...."

36. *K & K Food Serv., Inc. v. S & H, Inc.*, 2000 OK 31, ¶ 16, 3 P.3d 705; *Skinner v. Braum's Ice Cream Store*, 1995 OK 11, ¶ 9, 890 P.2d 922; *Buck's Sporting Goods, Inc. v. First Nat'l Bank & Trust Co.*, 1994 OK 14, ¶ 11, 868 P.2d 693.

37. *K & K Food Serv., Inc. v. S & H, Inc.*, see note 36, supra; *Phelps v. Hotel Management*, 1996 OK 114, ¶ 8, 925 P.2d 891; *Roper v. Mercy Health Center*, 1995 OK 82, ¶ 4, 903 P.2d 314.

38. *Prichard v. City of Oklahoma City*, 1999 OK 5, ¶ 19, 975 P.2d 914; *Krokowski v. Henderson Nat'l Corp.*, 1996 OK 57, ¶ 8, 917 P.2d 8; *Carris v. John R. Thomas & Assoc.*, 1995 OK 33, ¶ 16, 896 P.2d 522; *Roach v. Atlas Life Ins. Co.*, 1989 OK 27, ¶ 15, 769 P.2d 158.

39. *Copeland v. Lodge Enterprises, Inc.*, 2000 OK 36, ¶ 8, 4 P.3d 695.

40. *Copeland v. Lodge Enterprises, Inc.*, see note 39, supra; *Davis v. Leitner*, 1989 OK 146, ¶ 13, 782 P.2d 924; *Weeks v. Wedgewood Village, Inc.*, 1976 OK 72, ¶ 12, 554 P.2d 780.

41. *Seitsinger v. Dockum Pontiac, Inc.*, 1995 OK 29, ¶ 16, 894 P.2d 1077.

42. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.E.2d 538 (1986). [Court weighed evidence, concluded it inadequate and required plaintiffs to come forward with more persuasive evidence to support their claim than would otherwise be necessary.]. See also, *Federal Trade Comm'n, v. Gill*, 265 F.3d 944 (2001) [Evidence must be more than "significantly probable" or more than "merely colorable" to avoid summary judgment.].

"clearly convincing." [43] Further, the movant need not bear the burden of producing evidence sufficient to establish a defense if the issue is one on which the party does not bear the burden of proof at trial.[44] Proffered evidence in the federal courts must rise to the level of the substantive evidentiary standard for trial.[45] Federal judges may consider only admissible evidence [46] and they need not scour the record in the search of disputed fact questions.[47] The federal approach to summary process has been characterized as the judiciary's intrusion into an area formerly viewed as almost exclusively within the jury's province. Further, it may adversely impact a civil litigant's constitutional right to jury trial.[48]

¶ 18 Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of public officials concerns a matter of public policy.[49] Further, allegations of wrongful termination based on reporting of an employer's kickback activities have been found sufficient to support an employee's cause of action on public policy grounds.[50] In *Vannerson v. Board of Regents*, 1989 OK 125, ¶ 11, 784 P.2d 1053 (1989), this Court determined that allegations of the illegal disposition of state property invoked public policy concerns. Here, there are allegations of illegal kickbacks and circumvention of the competitive bidding statutes—certainly, both involve the possibility that state property has been dealt with improperly.

¶ 19 With the above principles in mind and our decision in *Vannerson*, the only plausible explanation for the majority's determination that summary judgment was properly entered is that it has chosen to take the federal approach to summary process [51]—a position not binding on this Court.[52] It certainly is

**43.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

**44.** *Celotex Corp v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**45.** *Anderson v. Liberty Lobby, Inc.*, see note 43, supra.

**46.** *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114 (2nd Cir.2001).

**47.** *Greer v. Board of Educ.*, 267 F.3d 723 (7th Cir.2001); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994).

**48.** D. Hostsenpiller, Comment, *"Anderson v. Liberty Lobby, Inc.*: Federal Rules Decision or First Amendment Case,"* 59 U.Colo.L.Rev. 933, 953–55. The Okla. Const. Art. 2, § 19, provides in pertinent part:
"The right of trial by jury shall be and remain inviolate...."

**49.** *Prager v. LaFaver*, 180 F.3d 1185, 1190 (10th Cir.1999), *cert. denied*, 528 U.S. 967, 120 S.Ct. 405, 145 L.Ed.2d 315 (1999); *Erickson v. Board of County Comm'rs*, 801 F.Supp. 414, 419 (D.Colo.1992).

**50.** See, *Antinerella v. Rioux*, 229 Conn. 479, 642 A.2d 699, 705 (1994); *Texas Dept. of Human Services v. Green*, 855 S.W.2d 136, 145–46 (Ct. App.Tx.1993); *Collier v. Superior Court*, 228 Cal. App.3d 1117, 279 Cal.Rptr. 453, 455 (1991).

**51.** Further, at least one federal court has determined that in a wrongful termination cause, the whistle blower need only point to "some" evidence raising a doubt about the employer's proffered explanation for the adverse employment decision to avoid summary disposition. *McCullough v. City of Atlantic City*, 137 F.Supp.2d 557, 573 (D.N.J.2001).

**52.** *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 2222, 135 L.Ed.2d 659 (1996) [The 7th Amendment governs proceedings in federal court, but not in state court.]. See also, *Pearson v. Yewdall*, 95 U.S. 294, 24 L.Ed. 436 (1877); *Walker v. Sauvinet*, 92 U.S. 90, 92, 23 L.Ed. 678 (1875); *Harada v. Burns*, 50 Haw. 528, 445 P.2d 376, 380 (1968). The Court of Civil Appeals has specifically addressed the issue of the applicability of the federal approach to Oklahoma summary judgment procedure and found it inapplicable. *Kating v. City of Pryor*, 1999 OK CIV APP 26, ¶ 8, 977 P.2d 1142. The same position has been taken by a number of other state courts. See, *Berner v. Caldwell*, 543 So.2d 686–88 (Ala.1989); *Jarboe v. Landmark Community Newspapers of Indiana, Inc.*, 644 N.E.2d 118, 123 (Ind.1994); *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 479–80 (Ky. 1991); *Lesbrookton, Inc. v. Jackson*, 796 S.W.2d 276, 286 (Tex.App.1990). See also, C. Adams, "Recent Developments in Oklahoma Civil Procedure," 33 Tulsa L.J. 539, 544 (1997) [The Oklahoma Supreme Court has not adopted federal standard for summary judgment. Instead, the Court continues to place the burden on the movant to demonstrate that there is no substantial controversy as to any material fact.]; C. Adams, "Developments in Oklahoma Civil Procedure 1997–98", 34 Tulsa L.J. 501 (1999) [The Oklahoma Supreme Court has not adopted the federal standard for summary judgment.].

not applying well-settled principles of Oklahoma law regarding both summary judgment and our obligation to take judicial notice of public policy established through statutory enactments.[53]

¶20 I express no opinion on whether any or all of the employees would succeed if given the opportunity to present their claims to a fact finder. Nevertheless, I will not usurp their opportunity to exercise a constitutional right to a jury trial when evidence has been presented to demonstrate material questions of fact concerning whether illegal kickbacks were either made or condoned and with the real possibility that public monies were not correctly marshaled through violations of the competitive bidding process. Therefore, I dissent.

---

**53.** Title *12 O.S.1991 § 2201,* see note 4, supra; *Davis v. GHS Health Maintenance Organ., Inc.,* see note 3, supra.